**Gary D. MOORE, Plaintiff–Appellant,**

v.

**The CITY OF KILGORE, TEXAS, Defendant–Appellee.**

No. 87–2783.

United States Court of Appeals, Fifth Circuit.

July 18, 1989.

Elizabeth K. Julian, Michael M. Daniel, Dallas, Tex., for plaintiff-appellant.

Mike A. Hatchell, Tracy Crawford, Tyler, Tex., for defendant-appellee.

Before GOLDBERG, HIGGINBOTHAM and DAVIS, Circuit Judges.

PER CURIAM:

Appellant Gary Moore brought this 42 U.S.C. § 1983 suit against the City of Kilgore to remedy a violation of Moore's First Amendment rights. This per curiam opinion explains the panel's holdings.

Part I of Judge Goldberg's opinion concerns the application of Kilgore Fire Department Rule and Regulation 4.2A(40) to Moore's speech. We unanimously reverse and remand for further proceedings on this issue. Judge Goldberg's opinion constitutes the reasoning of the court on this issue.

There is a second issue in this case concerning the facial validity of the Kilgore Rule. An opinion by Judge Higginbotham, in which Judge Davis joins, constitutes the panel's holding affirming the District Court's judgment that Moore's facial attack upon the rule fails. Part II of Judge Goldberg's opinion constitutes a dissent from the panel's affirmance of the district court's judgment concerning the facial validity of the Rule.

GOLDBERG, Circuit Judge:

Fiery words may both ignite public discourse and set aflame an employer's ire. The City of Kilgore, appellee-defendant, ("City") maintains that we should smother the words of Gary Moore, appellant-plaintiff ("Moore"). Moore invites us to hold that his words are a matter of public concern which weigh in his favor under the *Pickering/Connick*[1] balancing test. Moore also seeks to overturn the City's Fire Department Speech Regulation, Article 4.2A(40), as facially unconstitutional.

Firefighter Gary Moore works for the City of Kilgore Fire Department. He spoke to the news media on December 17, 1985, concerning a fire which had occurred the day before his interview. The City disciplined Moore for his speech. Moore brought a 42 U.S.C. § 1983 action for damages, declaratory and injunctive relief against the City of Kilgore. After a bench trial, the court entered judgment for the City. Moore appeals on three grounds: (1) that the district court erred when it found that some of Moore's statements are not "protected speech;" (2) that the district court erred in its application of the *Pickering/Connick* balancing test to one statement which the court found to be a matter of public concern; and (3) that the district court erred in determining that Article 4.2A(40) ("Rule") of the Rules and Regulations of the Kilgore Fire Department was facially constitutional. We agree with Moore on his first two objections; we reverse the district court and remand for further proceedings consistent with this opinion.

## FACTS—LAY OF THE TERRAIN

In 1985, the City of Kilgore experienced serious financial difficulties. With oil profits dwindling, the City had to cut city services. The City Commissioners and the City Manager, Ron Cox, determined that they would have to lay off forty employees by October 1, 1985. The fire department was the hardest hit with eleven projected lay-offs for a total reduction of fifteen positions (four vacancies were left unfilled).

The layoff of firefighters did not occur behind closed doors. At the trial before the district court, Moore introduced into evidence numerous newspaper articles which document the controversy surrounding the staffing of the fire department. For example, one article on October 6, 1985 that appeared in the *Tyler–Courier–Times–Telegraph* began, "Controversy is smoldering here between city officials and firemen—targets of recent city budget cutbacks. The key spokespersons in the battle of words are Gary Moore, president of an organized firefighters' 'union,' and Ron Cox, Kilgore city manager." In another newspaper article which ran on October 2, 1985, the article quotes a statement that

---

**1.** *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (*Pickering/Connick* balancing test); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

the firefighters published: "It is difficult not to be emotional when we are talking about the lives and property of citizens whom we have sworn to protect."

Moore began his employment as a Kilgore firefighter in 1980. He is a third generation firefighter, following in the footsteps of his grandfather, father, and uncle. He has been president of the Kilgore Professional Firefighters Association, Local 2996, since July, 1985, and serves as the spokesperson for the firefighters. The Association is not recognized as a collective bargaining agent for employees of the Kilgore Fire Department, but is recognized in the Kilgore area as the voice of the firefighters. Ron Cox, the City Manager, acted as the spokesperson for the City during the latter half of 1985.

In the early morning hours of December 26, 1985, the Kilgore Fire Department responded to a house fire. Although a suspected result of arson, the fighting of the fire was essentially routine. The fire, however, produced tragic results. One firefighter, Hawthorne, died of an apparent heart attack while fighting the fire, and a second, Captain Jackson, fell from a ladder, sustaining serious injuries requiring hospitalization. Media representatives approached Moore for comments concerning the tragedy. Moore initially demurred. He went to see the City Manager, Cox, for two purposes: (1) to assist in expediting the paperwork to secure benefits for the survivors of the deceased fireman; and (2) to inform Cox of the inquiry from the press and coordinate his response concerning the death with the City's plans.

The fire chief was in Cox's office when Moore arrived on December 26, 1985. The two had been discussing various aspects of the fire. Moore was welcome; the meeting was cordial. Moore stated the reasons for his visit. As to the reporters' inquiries, Cox suggested that Moore limit his response to an expression of sympathy for the family of his deceased colleague.

The following morning, December 27, 1985, the City held a press conference, *after* which the media representatives sought comment from Moore. Moore responded with a message of condolence for the family. Not surprisingly, the press persisted with questions about the fire reflecting back to the ongoing debate regarding the staffing decisions. Moore answered direct questions concerning the fire, firefighting techniques, and the duties of firefighters in fighting blazes. Specifically, the newspaper article (which was attached to the disciplinary memorandum discussed below that Cox eventually gave to Moore) stated:

Gary Moore, president of the Kilgore Professional Fire Fighters Association, to which Hawthorne belonged, commented: "B.J. was a very nice man and a good firefighter. Firefighters get to be pretty close. We're just sickened over something like this."

Moore said he was "not saying that B.J. wouldn't have had a heart attack" if the fire had not occurred, but contended the incident pointed out that "we don't have enough manpower."

He added that the fire department sent No. 1 engine—a two-man company—and No. 3 engine—a three-man company, and then called in firefighters from Overton, Sabine and Liberty City, the Kilgore Rescue Unit and four or five off-duty firemen.

"It's common practice to have a 'butt man' to hold the ladder. Jackson didn't have that." Moore said, "The other man had to stay with the engine."

"I just want to say, 'I told you so.'" Moore added referring to his earlier charges that the fire department is understaffed following a lay-off of 15 firemen in October.

City officials declined to respond to Moore's charges, other than pointing out that ice was on the ladder and concrete, making them slippery.

"We're dealing with a shortage of manpower. It may not have made a difference in B.J. Hawthorne's heart attack. We really don't know. But there was no doubt it contributed to Capt. Jackson's injury." Capt. Jackson had fallen from a ladder. The latter statement referred to the absence of a "buttman" to hold Jackson's ladder as he

**368**

climbed, a fundamental practice, according to Moore.

Publication of these comments spurred Cox to order Moore to report to his office on December 31, 1985. When Moore arrived, Cox had a prepared memorandum imposing disciplinary sanctions, including: (1) suspension without pay for 30 days; (2) demotion from the status of driver to firefighter; (3) probation for six months; and (4) prohibition from visiting any fire station for any reason during the suspension without the prior approval of the fire chief. In the disciplinary memorandum, Cox wrote:

> Both Chief Duckwork and I directed you to say as little as possible and not discuss the events surrounding the fire because of the delicate nature of the circumstances with the potential of arson involved, and the death of a fireman during the fire. Specifically, I told you to be very, very careful with what you said. I recommended you limit your comments to indicate your regrets over Lt. Hawthorne's death on behalf of the Association.

> At the close of the conversation, you told me that you would say no more than what we had discussed in this conversation to the media and I agreed. You also indicated, with our agreement, that you would be at the press conference to be held Friday morning, December 27, in order to express the regrets of the Association regarding Mr. Hawthorne. You attended that press conference.

> On Friday, December 27, the Kilgore News Herald carried the newspaper article, a copy of which is attached to this memo, that quotes you discussing several details of the fire itself. On Friday evening of that same day, you conducted a television interview, on Channel 7, Tyler, and discussed various details of the fire in violation of this directive. And finally, articles in the Friday evening, December 27, and Saturday morning, December 28, (also attached) issues of the Longview Journal, again quoted you describing various details of the fire itself.

Cox went on in the memorandum to state:

> You have misrepresented to me your intentions. You had stated you would say no more than what we had discussed and agreed upon, and proceeded to discuss with the media what you considered the facts to be regarding the fire. This, again, is insubordination. For your information, insubordination is defined in the dictionary as "not being subordinate or obedient." To be subordinate is to be "subject or subservient to another." It is our responsibility and duty as employees to be subject to the rules and regulations of the City.

> Mr. Moore, you are an employee of this City. You are not expected to agree with every policy or every directive that is given to you, but you are expected to follow them. You have been supplied with a copy of the Fire Department Rules and Regulations and are expected to know what those rules and regulations are. In addition, you were directed verbally to refrain from any discussion of the events surrounding the fire.

The memorandum concluded with Cox's directive to Moore: "There will be no more public announcements by you regarding your opinion of any policies or directives issued by this City." The memorandum cited and quoted Article 4.2A(40) of the Rules and Regulations of the Kilgore Fire Department which directs firefighters to:

> Refrain from furnishing information relative to department policy, practices, or business affairs except as authorized by the Chief of the Department.

After an unsuccessful attempt to secure a reconsideration of the disciplinary order, Moore filed this suit seeking declaratory and injunctive relief, damages, and attorney's fees for infringement of his First Amendment rights. Trial on the merits was advanced and consolidated with the hearing on the application for injunctive relief. Fed.R.Civ.P. 65(a).

After a bench trial, the district court denied Moore all relief. It did find that Moore had been disciplined for his public comments. The court, however, concluded that only the reference to a manpower shortage was even arguably a matter of public concern, and that the remainder of

the statements were merely "carping criticisms, causation analysis that approaches fingerpointing, and divulgence of possibly sensitive information about the composition and duties of fire department companies in emergency situations." In addition, the court concluded that Moore's First Amendment right to speak out on matters of public concern was outweighed by a legitimate governmental interest in the efficient operation of the city fire department. Finally, the court found that Article 4.2A(40) of the Kilgore Fire Regulations was facially constitutional. The district court entered judgment for the City. Moore appeals.

## DISCUSSION

The City of Kilgore disciplined Gary Moore for the comments he made on December 26, 1985, concerning the fire in which two firefighters were injured, one fatally. Neither party contends otherwise.

We undertake a two-part inquiry in this case: first, we will pass upon the district court's application of the *Pickering/Connick* balancing test to Moore's speech; and second, we will consider the facial constitutionality of the Kilgore Fire Department Speech Regulation. The district court held (1) that the First Amendment did not protect Moore's speech; and (2) that the Speech Regulation is facially constitutional. We reverse the first determination. I write separately in dissent concerning the facial constitutionality of the Kilgore Rule.

### I. Pickering/Connick Balancing Test As Applied To Moore's Speech

To begin, we discuss the application of the Kilgore Fire Department Speech Regulation to Moore's comments in light of *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). To accomplish this first step we need to decide whether Moore's speech constitutes commentary upon matters of public concern, and if so,

whether the interest of the City as an employer, "in promoting the efficiency of the public services it performs through its employees" outweighs Moore's and the public's interest in the speech.

A city may not discipline an "employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); *Perry v. Sinderman*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). The City disciplined Moore on the basis of his speech pursuant to Kilgore Fire Department Regulation, Article 4.2A(40), which states: "Refrain from furnishing information relative to department policy, practices, or business affairs except as authorized by the Chief of the Department."

### A. Matters of Public Concern

A threshold issue in determining whether Moore's speech is constitutionally protected is whether Moore's speech may be "fairly characterized as constituting speech as a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689–90, 75 L.Ed.2d 708 (1983).

■ "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690–91. Such an inquiry is a question of law, not fact. *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690–91 n. 7. And we have an obligation, imposed by the Supreme Court's First Amendment cases, to examine independently the *whole* record to be sure that "the judgment does not constitute a forbidden intrusion on the field of free expression." *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2897 n. 9, 97 L.Ed.2d 315 (1987) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 284–86, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964)).

We, therefore, now examine the record as a whole paying particular attention to the content, context, and form of Moore's

speech to see if the speech concerns matters of public concern. But as we undertake this task, we are mindful that a speech's content, form and context must be considered as a whole package, and the significance of these factors will differ depending on the circumstances of the particular situation.

Issues which touch upon matters of public concern are limitless. In this case, the content of Moore's speech concerned a possible shortage of firefighters to battle a blaze in which one firefighter died from a heart attack and another fell from a ladder. Moore commented that "the fire department sent No. 1 engine—a two-man company—and No. 3 engine—a three-man company, and then called in firefighters from Overton, Sabine, Liberty City, the Kilgore Rescue Unit and four or five off-duty firemen." All these comments concern whether the fire department was understaffed. Moore was also quoted as saying "It's a common practice to have a 'butt man' to hold the ladder. [Captain Jackson, the firefighter who was seriously hurt when he fell from a ladder,] didn't have that.' Moore stated, 'The other man had to stay with the engine.'" Again, Moore's comments touched upon the possibility of a staffing shortage. Even Moore's comment "I just want to say 'I told you so'" refers to his past comments, all of which concerned the staffing of the fire department.

The public, naturally, cares deeply about the ability of its Fire Department to respond quickly and effectively to a fire.[2] If staffing shortages potentially threaten the ability of the Fire Department to perform its duties, people in the community want to receive such information. The public had an interest in hearing the content of Moore's speech.

■ The First Amendment's freedom of speech clause protects such speech. Freedom of speech presupposes both a willing speaker and a willing listener. A listener's interest enjoys protection just as the speaker's interest finds refuge behind the shield of the First Amendment. The Supreme Court's jurisprudence well supports this understanding of the First Amendment. *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756–57, 96 S.Ct. 1817, 1822–23, 48 L.Ed.2d 346 (1976) (citizens have a right to receive advertising information); *Kleindienst v. Mandel,* 408 U.S. 753, 758, 762–65, 92 S.Ct. 2576, 2579, 2581–83, 33 L.Ed.2d 683 (1972) (citizens' right to hear alien's speech); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 386, 89 S.Ct. 1794, 1804, 23 L.Ed.2d 371 (1969) (purpose of First Amendment is to preserve an uninhibited marketplace of ideas in which truth ultimately will prevail; thus, the public must be able to hear the ideas and experiences to be able to participate); *Thomas v. Collins,* 323 U.S. 516, 534, 65 S.Ct. 315, 324, 89 L.Ed. 430 (1945) (right of workers to hear what labor organizer had to say abridged by state law requiring organizers to register before soliciting union membership); *Martin v. City of Struthers,* 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943) (freedom of speech necessarily protects the right of citizens to receive information); *see also*

---

**2.** *See Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 2897–98, 97 L.Ed.2d 315 (1987). In *Rankin* the Supreme Court held that the statement at issue "plainly dealt with a matter of public concern." The case concerned a clerical employee who remarked, after hearing of an attempt on the life of the President, "If they go for him again, I hope they get him." The Supreme Court characterized this statement a matter of public concern because it was made in the course of a conversation addressing the policies of the President's administration. *Rankin,* 107 S.Ct. at 2897; *see generally Brown v. Texas A & M University,* 804 F.2d 327, 336–38 (5th Cir. 1986) (need to protect whistleblowers). The Court went on to note that "debate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Rankin* at 107 S.Ct. 2898 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)); *cf. Terrell v. University of Texas System Police,* 792 F.2d 1360, 1362–63 (5th Cir.1986) (case preceding *Rankin* which involved speech contained in a private diary, in which the speaker "made *no effort to communicate* the contents of the notebook to the public" (emphasis added)). The speech in our case is not linked to a personal employment dispute between Moore and the City. *See Terrell,* 792 F.2d at 1363.

*Brawner v. City of Richardson, Texas,* 855 F.2d 187, 191–92 (5th Cir.1988) (allegations of police misconduct constitute matter of public concern).

While our analysis is grounded in significant part on the importance to the public of the content of Moore's speech, Moore, as a citizen, also has a significant interest in speaking his mind on matters of public concern that factors importantly into our analysis. The First Amendment accords all of us, as participants in a democratic process, room to speak about public issues. The operation of the city Fire Department certainly is a matter that concerns interested citizens. When Moore spoke about the fire on December 26, 1985, he spoke as an informed citizen regarding a matter of great public concern. Thus, the content of Moore's speech concerns a matter of public concern.

■ We now turn to our context analysis. The district court stated:

the need for public debate on the staffing issue had passed. The City Commission had chosen their policy and implemented the same as of October 1, 1985; three months before Moore's comments. Moore had opposed the action publicly on behalf of the Association, but his proposed course was not the one followed. The issue, as of December 26, was moot. Using this misfortune as the first opportunity to rehash this issue does not directly address matters of public concern, but rather smacks of a disgruntled employee attempting to draw public attention to this job-related issue.

The district court misses the point. The judiciary cannot declare the issue "moot." Although a particular incident may have passed into history, the caldron of ideas, implicating the incident may continue to boil. The underlying philosophical, political and social issues do not evaporate because of an *ex post* judicial declaration of "mootness."

The media in this case approached Moore, asked him for his comments, and printed his responses. The caldron was still simmering concerning the issue. While many cases touching the First Amendment may not receive media coverage, our case is even simpler. Here the pot was still bubbling; because the public was receptive and eager to hear about the ability of the Fire Department to perform its duties. Just because three months had passed since the budget cuts had been made, then, did not make the issue "moot." In a representative government, decisions often are not "final." Public pressure can mount, citizens can vote new people into power, and decisions can change. The power of public speech is its ability to influence, often in unseen ways, and protect our democratic form of government. Thus, our analysis of the context in which Moore's speech was uttered also leads us to conclude that his speech involves a matter of public concern.

■ Finally, we turn to an analysis of the form of Moore's comments. They do involve a hint of personal "employee" [3] considerations ("I just want to say, 'I told you so.' "). However, mixed motivations are

---

**3.** The Supreme Court also summarizes this "matter of public concern" inquiry in the conclusory terms of whether an employee is speaking as an "employee" versus as a "citizen." Specifically, the Court in *Connick v. Myers* stated: "We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. [citation omitted] Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government...."

*Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). We have accomplished this inquiry by examining the content, context, and form of Moore's speech. We have not, however, used the labels "employee" and "citizen" because as an analytical matter, these labels can be misleading. Confusion in analysis can result because such an inquiry may cause us to lose sight of the inherent public-natured content of speech which in the context may appear to relate to an on-going employee matter. Therefore, for the sake of clarity, we have examined the content, context, and form of Moore's speech to determine whether he spoke as an employee or as a citizen. We conclude that Moore spoke as a "citizen."

involved in most actions we perform everyday; we will not hold Moore to herculean standards of purity of thought and speech, ever assuming Moore's motivations were mixed. Taking Moore's speech as a whole, and considering the content, context, and form together, we hold that Moore's speech does involve a matter of public concern— the effectiveness of the Fire Department in fighting fires.

### B. Pickering/Connick Balance

■ Because Moore's speech addresses a matter of public concern, we proceed to the second step of our *Pickering/Connick* inquiry. *Pickering* requires that we determine whether the interest of the employer "in promoting the efficiency of the public services it performs through its employees" outweighs Moore's and the public's interest in his speech that addresses a matter of public concern. *See Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). The City bears the burden of producing evidence which shows its interest in disciplining Moore for his speech. *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2892, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 150, 103 S.Ct. 1684, 1691–1692, 75 L.Ed.2d 708 (1983). The strength of the "city interest" that the City must demonstrate depends on the strength of the "speech interest" in the scale's other pan. In *Connick*, the Supreme Court corrected a district court that misapprehended this balancing process. The Supreme Court stated:

> The District Court viewed the issue of whether Myers' speech was upon a matter of "public concern" as a threshold inquiry, after which it became the government's burden to "clearly demonstrate" that the speech involved "substantially interfered" with official responsibilities. Yet *Pickering* unmistakably states, and respondent agrees, that the State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. Although such particularized balancing is difficult, the courts must reach the most

appropriate possible balance of the competing interests.

*Connick*, 461 U.S. at 150, 103 S.Ct. at 1691. Naturally, we will not consider either side's interest in a vacuum. The "manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2898, 97 L.Ed. 2d 315 (1987).

### 1. Interest in Moore's Speech

On the freedom of expression side of the balance, both Moore and the public have a strong interest in Moore's speech. The effectiveness of Fire Department services concerns the people of the City of Kilgore. Moore's informed speech provides the public with valuable information that is otherwise difficult to obtain unless an informed person speaks out. Moore also has a significant interest in speaking on this issue. Dissemination of information throughout the community may bring the community's suasion to bear on the issue of the effectiveness of the Fire Department. *See Pickering v. Board of Education*, 391 U.S. 563, 572, 88 S.Ct. 1731, 1736, 20 L.Ed.2d 811 (1968) ("Teachers are, as a class, the members of the community most likely to have informed and definite opinions as to how funds alloted to the operation of the schools should be spent [a matter of public concern.] Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal"). A speaker hopes that his or her speech will set afire the political conscience of the community. As an informed citizen, Moore's comments and insights constituted powerful knowledge concerning the effectiveness of the public entity, the Fire Department. In the long term, his speech is likely to help produce a fire department that is increasingly responsive to the needs of the citizenry.

The timing of Moore's speech certainly tilts in favor of the public nature of the speech; the speech occurred in response to two firefighters receiving injuries, one fatally, while fighting a fire. As to the manner, a portion of the speech was a bit acidic ("I told you so"). But the speech as a

whole was directed more to the fire and the department's staffing than it was to Moore's past discussions with the City. The speech arose in the midst of a continuing dispute concerning the ability of the Fire Department to fight fires effectively. Moore hoped to spark a roaring and robust public debate concerning the issue. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964) ("[D]ebate on public issues should be uninhibited, robust, and wide-open").

Thus, the interests of both Moore and the citizens of Kilgore in Moore's speech are extremely significant. Moore's speech does not merely touch upon matters of public concern in a marginal manner. His speech, considered as a whole, dwells at the center of the First Amendment, unlike in *Connick v. Myers*, 461 U.S. at 150, 154, 103 S.Ct. at 1691, 1693, (1983), in which the employee's questionnaire distributed to coworkers touched upon matters of public concern only in a more limited sense.

### 2. City's Interest in Effective Fire Department Services

The other side of the *Pickering/Connick* balancing test focuses on the City's interest in effective governance. To evaluate this element, we must examine the City's justification for taking disciplinary action against Moore in relation to the City's legitimate interest in the effective functioning of the public employer's enterprise. *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2898–99, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 150, 103 S.Ct. 1684, 1691, 75 L.Ed.2d 708 (1983). Our inquiry focuses on the "effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong [city] interest." *Rankin v. McPherson*, 107 S.Ct. at 2899.

In evaluating whether the City has met its burden of justifying its action, we consider the *Rankin* Court's summary of several pertinent considerations:

whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.
*Rankin v. McPherson*, 483 U.S. 438, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987).

The City offers three reasons—insubordination, impaired arson prosecution, and a desire to disseminate accurate information—to justify its action in disciplining Moore for his speech. We will discuss each City interest in turn.

The first offered reason, insubordination, requires some explanation. From Ron Cox's viewpoint as the City Manager, Cox believed that he and Moore had reached an agreement during a meeting in Cox's office on December 26, 1985 held at approximately 3:00 p.m. Cox believed Moore breached their agreement when Moore spoke on matters beyond an expression of condolence for the families of the deceased and the injured firefighters. In the disciplinary memorandum that Cox presented to Moore during the December 31, 1985 disciplinary meeting, Cox wrote,

You have misrepresented to me your intentions. You had stated you would say no more than what we had discussed and agreed upon, and proceeded to discuss with the media what you considered the facts to be regarding the fire. This, again, is insubordination. For your information, insubordination is defined in the dictionary as "not being subordinate or obedient." To be subordinate is to be "subject or subservient to another." It is our responsibility and duty as employees to be subject to the rules and regulations of the City.
Mr. Moore, you are an employee of this City. You are not expected to agree with every policy or every directive that is given to you, but you are expected to follow them. You have been supplied with a copy of the Fire Department Rules and Regulations and are expected to know what those rules and regulations

are. In addition, you were directed verbally to refrain from any discussion of the events surrounding the fire. This flagrant insubordination cannot and will not be tolerated. As a result, disciplinary action must be taken.

Cox disciplined Moore for what Cox ostensibly viewed as insubordinate speech. Mr. Cox also had transcribed the disciplinary meeting on December 31, 1985 during which Cox presented Moore with the memorandum quoted in part above. During the disciplinary meeting, Cox said, "If your personal opinion is contrary to [the City's] policies, then you've got two choices, Gary, you can work within those policies and work internally within proper channels to express your opinions and to possibly get those changed. If that is needed. If they're not changed and if you continue to be dissatisfied, you can leave." [Plaintiff's exhibit 3, page 6).

For the City Fire Department to function efficiently, discipline and respect for management authority are important to the City. The City does have a legitimate interest in promoting a well-ordered fire department. But discipline for more abstract and attenuated management purposes that do not directly relate to the actual fighting of fires—the primary responsibility of the Fire Department—is an interest of lesser magnitude than discipline that relates directly to the business of fighting fires. The City presented no evidence that Moore's insubordinate statement interfered in any way with the actual fighting of fires.

A fire department should be a disciplined, well-oiled unit of firefighters because when firefighters arrive on the scene of a blazing, dangerous fire, the members of the unit must work together in an effective manner to protect the lives of the citizens and themselves and to extinguish the fire as soon as possible. Discipline *directed towards the goal of fighting a fire effectively* is the backbone of a high quality fire department.

The type of discipline that the City imposed upon Moore is different. It concerns the City government as a whole organization and Moore as a city employee. In this situation, the concentration of discipline necessary to regulate employee behavior is significantly more diffuse. Some degree of discipline is desirable but strict, marine-like control is not necessarily appropriate to the running of a city as an organization.[4]

The key fact in this case is not that Moore is a firefighter; rather, it is that Moore is a city employee. Cox, the City Manager, attempted to maintain control over the City's employees by rendering them "obedient" and "subservient." If Moore had been a typist in the Fire Department, presumably Cox would have required the same degree of discipline and loyalty. As we stated before, the City has a legitimate interest in maintaining a disciplined force of City employees. But that interest is of lesser weight than the interest in discipline needed within the Fire Department itself, discipline that allows the members of the department to act as an effective fire-fighting unit when the moment arrives.

Cox's view, that Moore as a public employee could either function within the no-speech rules or Moore could leave, was unchallenged dogma for a large part of this century. Justice Holmes, then sitting on the Massachusetts Supreme Judicial Court, stated it best when he wrote "[A police-man] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517, 518 (1892); *see Connick v. Myers,* 461 U.S. 138, 143–44, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983).

■ An employee does not abandon his or her First Amendment rights when the employee agrees to work for a public entity. This balancing methodology that we utilize is meant to protect the employee's

---

**4.** *Cf. Bickel v. Burkhart,* 632 F.2d 1251, 1257 (5th Cir.1980) ("where a fireman, motivated by resentment, bitterness and self-aggrandizement engages in disruptive conduct intending to undermine the authority of department officers, the speech accompanying such conduct is not constitutionally protected").

speech regarding matters of public concern without overburdening the public employer's ability to function effectively in its assigned tasks. Creating room for free speech in a hierarchical organization necessarily involves inconveniencing the employer to some degree. Speech concerning public affairs usually creates attendant inefficiencies in the running of the public entity. But efficiency is not an end-all and be-all goal of a democracy. Speech among the people helps to maintain the vitality of self-government. *See Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed. 2d 708 (1983). For as Sir Winston Churchill stated:

Many forms of government have been tried, and will be tried in this world of sin and woe. No one pretends that democracy is perfect or all-wise. Indeed, it has been said that democracy is the worst form of Government except all those other forms that have been tried from time to time.

Address by Sir Winston Churchill, House of Commons (Nov. 11, 1947), *reprinted in The Oxford Dictionary of Quotations* 150 (3d ed. 1979).

Moore's speech, which Cox views as insubordinate, does burden the efficient operation of the City as an organization. However, keeping in mind that Moore's speech does not hinder the ability of the Fire Department to perform its primary task—fighting fires—we find that the City's burden due to insubordination is minimal. In addition, the City presented no evidence, other than Cox's views, that Moore's arguable insubordination disrupted the work of the City. *See Rankin*, 107 S.Ct. at 2899.

The second interest the City relies upon to balance out the weighty interest in Moore's speech focuses upon arson. Cox summarized how Moore's speech affected the City's interest concerning an arson investigation. The portion of Moore's speech that concerned Cox was:

This was just an *ordinary structure fire* .... What's going to happen when something major happens? We're dealing with shortage of manpower. It may not have made a difference in B.J. Haw-

thorne's heart attack. We really don't know. But there was no doubt that it contributed to Capt. Jackson's injury.

Then during direct examination of Cox, Cox stated,

I think a defense lawyer on behalf of that individual who's charged with that would use Mr. Moore's statement as an authoritative statement, someone on behalf of the City of Kilgore in some manner, as being one of fact that it wasn't arson, it was ordinary, and would have a tendency to bias those people making a decision, whether it be a Jury or a Judge ... with regard to his contention that there's a manpower shortage, I would think that, if I were a defense lawyer, I would be trying to mold the Jury's mind to believe that the house was not destroyed by the arson alone, but by virtue of the fact that the City did not have enough people to handle the fire itself.

Tr. at 54–55.

The City has an interest in promoting its ability to prosecute an arson case. Any damage Moore's "ordinary structure fire" comment could inflict upon a potential arson prosecution by the City would be very minimal. In regard to the phrase "ordinary structure fire," Moore's explanation of his usage could certainly be brought out by the prosecutor in an arson case to rebut whatever defense inference was available. Moore stated, on direct examination in this case, "What I'm referring to as an ordinary structure fire was that this was not a plant or a major structure of any kind. It was a medium size house. It was not an oil related fire. It was just, as far as I'm concerned, an ordinary structure fire, which would be an ordinary house fire."

As to Moore's manpower shortage comment, this comment could slightly affect an arson prosecution, but such an interference would be insubstantial. Any arson prosecution will be won or lost on the physical evidence (presence of an incendiary agent, damage to the structure as evidence of the cause of the fire, and motive and opportunities of the suspect). Moore's comment concerning the shortage of firefighters would not substantially interfere with the City's

prosecution of an arson suspect. The City's interest in a potential arson prosecution is a flicker of a candle's flame compared with the radiating incandescence of Moore's speech.

The third interest the City asserts as legitimate is its desire to control the flow of information so that the City can ensure that speakers disseminate only "accurate" information. Cox stated on recross-examination that "all of the statements [by Moore] were important, because of the impact they have on the public's perception of what happened; ... [if] it turned out that Mr. Moore didn't have the facts and if we're going to be quoted, we need to be accurate." (Tr. at 73).

Two considerations militate against the City's third proffered interest. The first is a consideration of timing. The second consideration concerns the interplay between the content of Moore's speech and the City's burden of proof.

The City's interest in an "accurate" flow of information is not absolute and does not enjoy durational eternity. Before Moore spoke the City held a press conference concerning the fire at which the City had ample opportunity to express its official view of the fire. In this case, the City's press conference occurred the next morning, December 27, 1985, after the fire. Moore's different angle on the same occurrence is precisely what encompasses the thrust of the public's interest in Moore's speech. Thus, any legitimate government interest in controlling the flow of accurate information dissipates after the public entity has had an opportunity to present its view, an opportunity that the City utilized in this case.

■ As to the second point, that the City viewed some of Moore's comments as misstatements, the *New York Times Co. v. Sullivan* standard applies. *Pickering v. Board of Education*, 391 U.S. 563, 572–74, 88 S.Ct. 1731, 1736–37, 20 L.Ed.2d 811 (1968); *see generally New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Before the City's interest in the accurate dissemination of information may carry *any* weight in the *Pick-*

*ering/Connick* balance, the City must prove that Moore made false statements of fact with either knowledge of their falsity or with reckless disregard of their truth or falsity. *Pickering*, 391 U.S. at 573–74, 88 S.Ct. at 1737. The City made no such showing in this case. It introduced no evidence that even begins to approach the *New York Times* standard. Thus, we accord no weight under the *Pickering/Connick* balancing test to the City's proffered interest in the control of the flow of information following the fire.

### 3. Balancing the Interests

■ We have examined the interests of the public and Moore in Moore's speech, which addressed matters of public concern. Moore's speech is of significant importance concerning the people's ability to govern themselves in the City of Kilgore, Texas. Now we must decide whether the City's three asserted interests, as a whole, outweigh the great magnitude of the interests of both Moore and the public in Moore's speech. The insubordination interest, in regard to the City as an entity, burdens the efficient operation of the City as an organization, but the burden is minimal. The interest concerning the City's ability to prosecute an arson case also has merit, but it does not approach a level of substantiality by itself that significantly affects our inquiry. The third proffered interest—the desire to control the flow of information—has no weight in this case. Combining the City's interests concerning insubordination and arson, we find that the side of the scales containing the interest in Moore's speech is firmly planted on the ground while the City's two interests dangle high above. The *Pickering/Connick* balancing test weighs heavily in Moore's favor.

The City does not dispute that it disciplined Moore based on the content of his speech. (Appellee's brief at 7). Thus, we conclude that Moore was disciplined for expressing constitutionally protected speech in contravention of his First Amendment freedom of speech rights. We reverse the judgment of the district court on this issue. The district court, because of

its holding, did not have to reach the issue of appropriate relief. Thus, we remand the case to the district court for a trial on the issue of appropriate relief. We intimate no view concerning what the correct measure of damages, beyond nominal damages, would be in this case. *See Memphis Community School District v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 2544–46, 91 L.Ed. 2d 249 (1986); *Carey v. Piphus,* 435 U.S. 247, 254–59, 98 S.Ct. 1042, 1047–50, 55 L.Ed.2d 252 (1978).

## II. Facial Validity of Kilgore Fire Rule 4.2A(40)

In our resolution of this case, we encounter a wicked wicket, which engagement we enter into with some trepidation. It is at this wicket that I must now part company with my brethren. As I do so, I am aware that the croquet balls of constitutional adjudication can be quite heavy, therefore, I shall try to use a light mallet to prevent the balls from leaving our grassy court.

In addition to his claim that the City of Kilgore Fire Department Speech Rule 4.2A(40) was unconstitutionally applied to him, Moore contends that the Rule is facially invalid. Moore asked the district court to enjoin the use of the Rule in his complaint, when in his prayer for relief, he included requests for "preliminary and permanent injunctions ... prohibiting enforcement of Kilgore Fire Department Regulation 4.2A(40)[.]". If the district court had granted Moore the requested relief, no one could ever be restrained or punished for disobeying the Rule because the Rule would be void. The district court ruled against Moore on this issue of facial invalidity, and the district court's ruling is affirmed by Judge Higginbotham's opinion for the majority.

The majority offers alternative holdings for its conclusion: first, that Moore has not properly presented his facial attack on the Rule for appellate review; and second, that assuming the issue is properly presented, that Moore, because he prevailed upon his claim that the Rule was unconstitutionally applied to him, does not have standing to assert a facial challenge to the Rule. Instead, the majority believes that Moore has "footed his facial challenge to the Fire Department Rule entirely upon grounds of overbreadth" as the Rule applies to "him— the plaintiff who is before us." The majority then concludes that in such a situation, it is inappropriate for a court to entertain a facial challenge based on overbreadth.

The majority errs for two reasons. First, I believe Moore has properly presented the issue of the facial invalidity for our consideration. Second, we should strike down the Rule as a prior restraint which is invalid in every application.

The issues that lie before us are complicated and, at times, wind around one another. Therefore I provide a roadmap—although perhaps one not equivalent in topographical precision to a Rand McNally version—which should be helpful for the jalopy driver and Indianapolis racer alike. First, I discuss the presentment issue. Second, I examine the underlying values embodied in the First Amendment (truth, knowledge, and tolerance). Third, I unwind the three threads of First Amendment jurisprudence contained in the district court's opinion and Moore's appeal (generic overbreadth, substantial overbreadth doctrine, and prior restraints). Finally, I consider the Kilgore Rule in light of all the foregoing considerations. The framework of analysis by which I consider the Kilgore case is close to outcome determinative. This observation is only true because, after examining the entangled threads of First Amendment jurisprudence in light of the framework surrounding the Kilgore Rule, it becomes apparent that the Kilgore Rule constitutes an unconstitutional prior restraint. The majority commits a pivotal error when it treats this prior restraint as an after-the-fact sanction. From this single, threshold mistake flows the body of my disagreement with the majority.

### A. Presentment of the Issue of Facial Validity

Concerning the facial invalidity of the Rule, the majority finds that Moore has presented to this Court only one argument: that the Rule is invalid because of the

overbreadth doctrine. As a consequence, the majority does not believe that Moore has presented an argument that the Rule is a prior restraint. Moore's briefs are not extensive concerning the facial invalidity of the Rule.[5] However, Moore has properly presented the issue of whether this Rule is an unconstitutional prior restraint at a sufficient level of generality to put the City on notice of the argument. Moore refers to the problems inherent in a prior restraint when he discusses the city's discretion and the muzzling effect of the Rule. Moore also generally attacks the district court's decision, which, I should add, also considers the Rule with respect to its prior restraint feature.

As I will discuss in Part II–C *infra*, confusion necessarily results from the linguistic overlap of the generic, descriptive use of the term "overbroad" with the First Amendment Doctrine of "substantial overbreadth." [6] The district court's use of the word "overbroad" is ambiguous regarding whether the court used the term in its generic sense, specific doctrinal sense, or both senses. Presented with an entangled area of constitutional jurisprudence, Moore probably has attacked the district court's disposition in a less than analytically ideal manner. Given the confusing nature of these jurisprudentially tangled threads of analysis, however, which I shall discuss more fully *infra*, I cannot agree with the majority that Moore's alleged error in analytical precision should foreclose this court from reviewing the district court's decision concerning the facial validity of the Rule.

In my view, because of the complexities of this area, common law-like assignments of error are not necessary for an issue to

---

**5.** Moore's Original Appellate Brief states: "Rule 3.2a(40) (sic) of the Kilgore Fire Department's Rules and Regulations is unconstitutional for overbreadth, both on its face and as applied.

The rule under which plaintiff was disciplined and under which plaintiff continues to work directs fire department employees to 'refrain from furnishing information relative to department policy, practice or business affairs *except as authorized by the chief of the department.*' (R.E. 22).

The rule is directed only to speech activities. It makes no distinction between information furnished by an employee as a citizen exercising First Amendment rights and information furnished in the role of an employee. *The rule contains no guidelines for the exercise of the chief's discretion in deciding what speech to authorize.*

*The City of Kilgore gives the rule its broadest interpretation in its application to plaintiff. He is and has been denied authorization to make any public statements concerning city business.* The memo desciplining plaintiff states: 'Conclusion Mr. Moore, I remind you again that you are an employee of this City. There will be no more public announcements by you regarding your opinion of any policies or directives issued by this City. Each employee has the choice of working for this City, or leaving to find other employment, should he disagree with the policies and practices ...' (emphasis added). (R.E. 22).

Similar rules prohibiting 'unauthorized' speech by public employees were found to be in violation of the First Amendment by the Fifth Circuit in *Barrett v. Thomas,* 649 F.2d 1193, 1199 (5th Cir.1981), *cert. denied* 456 U.S. 925, & 456 U.S. 936, 102 S.Ct. 1969, 102 S.Ct. 1992, 72

L.Ed.2d 440, 72 L.Ed. 455 (sic). There is nothing to distinguish Kilgore's rule from the same verdict, particularly as it has been applied to plaintiff to *prohibit all public statements by him.*"

Moore's Reply Brief states: "Plaintiff was disciplined pursuant to and continues subject to a rule which is unconstitutionally overbroad on its face.

Despite defendant's bold declaration to the contrary, the challenged Fire Department rule does indeed 'make freedom of expression its substantial target.' *Janusaitis v. Middlebury Volunteer Fire Department,* 607 F.2d 17, 28 (2d Cir.1979). The only target of the rule, unlike many cited by defendant, is the disemination (sic) of 'information relative to department policy, practice or business affairs.' The only exception made is such information as is authorized by the fire chief or department. *The city manager, relying on this rule, in disciplining plaintiff, instructed plaintiff that this prohibition includes any public announcements by Mr. Moore of his opinion of any policies or directives issued by the city.* R.E. 22. While clearly a city may have comprehensive, even broad, rules and regulations prohibiting or regulating the conduct, including the speech, of employees which could be harmful to the legitimate ends of the governmental entity, *rules as overbroad as this,* should not be allowed to *form the basis for a muzzle* on an employees' involvement in legitimate public discussion of issues in which that employee may be particularly interested or informed." (emphasis added).

**6.** *See Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 2851–52 n. 13, 81 L.Ed.2d 786 (1984).

be properly presented to the appellate court. Moore has attacked the Rule on its face, requesting specific injunctive relief in the process concerning the facial status of the Rule. The use of the ambiguous term "overbroad," [7] which Moore appears to have used in its generic, descriptive mode, coupled with the discussion in his briefs that the "rule contains no guidelines for the exercise of the chief's discretion in deciding what speech to authorize," and that Moore "is and has been denied authorization to make any public statements concerning city business (including future statements of any sort)," should be enough to present the entangled problems of: (a) a prior restraint; (b) the legal doctrine of substantial overbreadth; and (c) the descriptive notion of a overbroad rule. I believe we are fully entitled to consider all relevant issues in Moore's case as they may relate to the district court's judgment that the Rule is facially constitutional. A prior restraint, enshrined in a written rule, should not live on because able advocacy becomes imperfect as a result of judicial and jurisprudential confusion.

### B. Values Which the First Amendment Embodies

As a method of adjudication, invalidating an entire rule as facially unconstitutional is certainly "strong medicine." *See Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973) (attacking statute on its face using doctrine of substantial overbreadth). A court which utilizes such medicine should consider the patient's ailment and risks of the medicine carefully before administering the dosage. However, when the ailment appears to be fatal, strong medicine may be the best prescription for the patient. The health of the patient—freedom of speech—should be a court's primary focus.

Both action and restraint by a court integrally affect First Amendment values. Failure to administer strong medicine when it is called for may undermine First Amendment values just as legitimately striking down a rule will nourish those same values. Thus, in examining the legal doctrines which criss-cross the First Amendment, it is important to keep one's eye always on the underlying reasons for freedom of speech so that the doctrines are not rent from their foundations.

Traditionally, "free speech is protected because it has values; it springs from the age of enlightment out of which the spirit of the American Revolution came. The values include truth-seeking and knowledge-advancement, as a societal object, as well as to a lesser degree perhaps, self-fulfillment on the part of the individual speaker [autonomy and individual dignity]." Oakes, *Tolerance Theory and the First Amendment,* 85 Mich.L.Rev. 1135, 1137 (1987).

Citizens in a democracy need to hear about problems that their government encounters. To assist people in making informed decisions, information must be made public for citizen deliberation. Purely "political" words are not the only words of truth and knowledge that the public needs or desires to hear. What is personal for one person is political for another. Thus, for the people to be able to judge for themselves the value or usefulness of particular speech, the people need to hear the actual words as spoken by the speaker, unfiltered and unabashed. Censorship spawns two great evils: distortion through the filtering of speech to conform with the censor's vision of truth and knowledge, and the chilling of potential speakers, especially the timorous who self-restrain valuable words from flowing with slight pressure from external sources.

In addition, there is also "a crucial social role for the free speech principle in the context of the assumed reality of an impulse to intolerance." L. Bollinger, The Tolerant Society: Free Speech and Extremist Speech in America 106 (1986). Free speech provides "a method of addressing a ubiquitous social incapacity, [the incapacity

---

**7.** *See Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 2851–52 n. 13, 81 L.Ed.2d 786 (1984) (explaining ambiguous use of the words overbroad and overbreadth).

within all of us of intolerance]." *Bollinger* at 107; *see* Oakes at 1139.

Speech that an official deems worthy of suppression commonly tends to criticize the official or the governmental body in some way. Humans dislike self-directed criticism. The intolerance within all of us can oversuppress speech which is otherwise useful either to the speaker or to a listener. The desire to suppress unpleasant or critical speech is almost irrepressible. As a society, and as a judicial body within our society, we should attempt where legitimately possible to encourage self-restraint rather than intolerance in regard to speech. *See* L. Bollinger, The Tolerant Society: Free Speech and Extremist Speech in America, 243–45 (1986).

Professor Bollinger sees free speech as "stand[ing] symbolically as the gateway to social intercourse." *Id.* at 238. "American society has evolved with this principle according to Bollinger because it is a capitalist economic society, with pervasive bureaucratic and professional systems, where personal preferences tend to be submerged; because it is composed of large immigrant groups of many different cultures and religions; because it is stable with a relatively homogeneous two-party system not likely to be supplanted by splinter, deviant groups. The First Amendment has taken on meaning, he again reminds us, beyond merely preserving meritorious speech or preserving an area of freedom for each individual beyond the reach of the State, a meaning which can be seen in the context of extremist speech cases. The meaning is that free speech principles enable us to see the elements in our thinking that distort our judgment in drawing the lines that inevitably have to be drawn in a pluralistic society. Free speech is thus a means, as well as an end." Oakes, *Tolerance Theory and the First Amendment*, 85 Mich.L.Rev. 1135, 1143–44 (1987).

Fostering tolerance, one hopes, also renders the impulse to intolerance less attractive in other, nonspeech areas. Tolerance of speech has the effect of spilling over into other areas of our pluralistic society, encouraging tolerance between people concerning the differences among us.

*C. Three Threads of First Amendment Jurisprudence: Generic Overbreadth, Substantial Overbreadth Doctrine, and Prior Restraints.*

In one, short paragraph,[8] the district court's analysis of Moore's facial challenge to the Rule interweaves three different yet interrelated threads of First Amendment jurisprudence. The district court's language—"[t]he rule on its face does not sweep beyond the constitutional barrier"— evidences one thread which encompasses the descriptive, generic use of the word "overbroad" to mean something which stretches too far: in other words, a statute that is not narrowly tailored. A second thread, found in the district court's conclusion of law flowing from the one paragraph discussion, reads: "Rule 4.2A(40) is not facially unconstitutional for overbreadth." The district court possibly used the word "overbroad" to mean the doctrine of substantial overbreadth, which is sometimes viewed as a third party standing notion. *See Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). A third thread invokes the whole substantive area of prior restraints as evidenced by the district court's words "[t]he regulation requires clearance through department channels before releasing information...."

1. Generic "Overbreadth" Versus "Substantial Overbreadth" Doctrine

Because of the linguistic overlap be-

---

**8.** The district court's opinion reads: "Nor is the evidence from this case sufficient to strike down the regulation in question as facially—always and however applied—invalid. *The regulation requires clearance through department channels before releasing information* 'relative to department policy practices, or business affairs.' For a variety of reasons, including safety and securi-ty, this is an area of legitimate government interest to control, or at least monitor, statements made by employees on possibly confidential or sensitive matters to prevent indiscrete disclosures. The rule on its face does not sweep beyond the constitutional barrier." (emphasis added).

tween thread one and thread two,[9] the district court's use of word "overbroad" introduces an ambiguity into the district court's opinion. One may read the opinion to be discussing either thread one—generic use of the word overbroad—or thread two—the legal doctrine of substantial overbreadth—or both notions. In *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 962, 104 S.Ct. 2839, 2851–52 n. 13, 81 L.Ed.2d 786 (1984), the Supreme Court discussed this sort of ambiguous use of the word "overbroad":

> The dissenters appear to overlook the fact that "overbreadth" is not used only to describe the doctrine that allows a litigant whose conduct is unprotected to assert the rights of third parties to challenge a statute, even though "as applied" to him the statute would be constitutional. *E.g. New York v. Ferber*, [458 U.S. 747, 768 n. 21, 102 S.Ct. 3348, 3360, 73 L.Ed.2d 1113 (1982)]. "Overbreadth" has also been used to describe a challenge to a statute that in all its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest. [citations omitted; *cf. City Council of Los Angeles v. Taxpayers For Vincent*, [466 U.S. 789, 797, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772 (1984)] (recognizing the validity of a facial challenge but suggesting that it should not be called 'overbreadth') [citations omitted].

Thus, the Supreme Court in *Munson* recognizes that the words overbroad and overbreadth have been confused but properly should be separated. In *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 797, 104 S.Ct. 2118, 2124, 80 L.Ed. 2d 772 (1984), the Supreme Court articulates two quite different ways by which a court may declare a statute or rule facially invalid. The first reason, which has deep historical roots in constitutional adjudication, is because the statute "is unconstitutional in every conceivable application." *City Council v. Taxpayers for Vincent*,

466 U.S. 789, 796, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772 (1984); *see City of Lakewood v. Plain Dealer Publishing Co.*, — U.S. ——, 108 S.Ct. 2138, 2143–45, 100 L.Ed.2d 771 (1988) (4–3 majority opinion; "facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers"). The second reason for a court to strike down a statute on its face is because the statute "seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.'" *Vincent*, 466 U.S. at 796, 104 S.Ct. at 2124. In *Vincent*, the Supreme Court also stated,

> [t]he seminal cases in which the Court held state legislation unconstitutional 'on its face' did not involve any departure from the general rule that a litigant only has standing to vindicate his own constitutional rights. In *Stromberg v. California*, 283 U.S. 359, 75 L.Ed. 1117, 51 S.Ct. 532, 73 ALR 1484 (1931), and *Lovell v. Griffin*, 303 U.S. 444, 82 L.Ed. 949, 58 S.Ct. 666 (1938), the statutes were unconstitutional as applied to the defendants' conduct, but they were also unconstitutional on their face, because it was apparent, that any attempt to enforce such legislation would create an unacceptable risk of suppression of ideas. In cases of this character a holding of facial invalidity expresses the conclusion that the statute could never be applied in a valid manner.

*Vincent*, 466 U.S. at 797–98, 104 S.Ct. at 2124 (footnotes omitted); *see City of Lakewood*, 108 S.Ct. at 2145; *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 1921, 95 L.Ed. 2d 439 (1987).

The *Munson* court, after pointing out the ambiguous use of the word overbroad, went on to state that it "was on the basis of the latter failing [overbroad because in all applications a statute directly restricts protected First Amendment activity and does not serve a compelling governmental

---

**9.** *See Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 104 S.Ct. 2839, 2851– 52 n. 13, 81 L.Ed.2d 786 (1984).

interest] that the Court in *Schaumburg [v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980)] struck down the Village ordinance as unconstitutional. Whether that challenge should be called 'overbreadth' or simply a 'facial' challenge, the point is that there is no reason to limit challenges to case-by-case 'as applied' challenges when the statute on its face and therefore in all its applications falls short of constitutional demands." *Munson*, 104 S.Ct. at 2852 n. 13 (1984).

Under *Vincent, Munson* and the string of cases they rely upon, if a rule is unconstitutional in all its applications, a plaintiff may challenge the rule as unconstitutional on its face. Under the substantial overbreadth doctrine, a person whose speech may be prohibited constitutionally may nevertheless prevail upon a facial challenge if the statute covers too much speech, and the statute's provisions are unseverable. *See Broadrick v. Oklahoma*, 413 U.S. 601, 611–13, 93 S.Ct. 2908, 2915–17, 37 L.Ed.2d 830 (1973). The extra coverage is determined by examining what hypothetical speakers might say, and determining whether constitutionally protected speech is included within the coverage of the statute. Because one looks at the speech of hypothetical third parties, the substantial overbreadth doctrine is often considered to be a third party standing notion. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985).

Others quite properly understand the "substantial overbreadth" doctrine in terms of first party standing. In first party terms, the doctrine is grounded on twin notions: that a "litigant's conduct may be regulated only in accordance with a valid rule," Monaghan, *Third Party Standing*, 84 Colum.L.Rev. 277, 285 (1984); Monaghan, *Overbreadth*, 1981 Sup.Ct.Rev. 1;

and if the rule applies to hypothetically protected areas of speech, the rule must be declared facially unconstitutional if the "permissible and impermissible parts of the statute are not severable." Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 244 (1988); *Broadrick v. Oklahoma*, 413 U.S. 601, 613–14, 93 S.Ct. 2908, 2916–17, 37 L.Ed.2d 830 (1973) (facial overbreadth not invoked when a limiting construction has been or could be placed on the challenged statute). Severability is the key to understanding the overbreadth doctrine in first party terms.[10] Cases in which a court decides that the statute or rule is unseverable involve, most typically, the decision that, given the nature and range of the act's invalidity, the lawmaker—federal, state, or local—would not want the severed statute to stand, or for federalist reasons, a federal court should not sever the statute. *See* Monaghan, *Overbreadth*, 1981 Sup.Ct.Rev. 1, 10–15.

### 2. Prior Restraints: Generically "Overbroad" Because Invalid in all Applications

A prior restraint is sometimes generically referred to as "overbroad" because there is no valid application of the restraint. Such a conclusion prompts the question, what is a prior restraint? As I shall discuss in Part D(1) infra, the majority does not delve into the content of prior restraints, but relies instead on its attempted distinction between prior restraints and after-the-fact sanctions. The majority, however, fails to recognize that a sanction may or may not be a reflection of an unconstitutional prior restraint, and that a prior restraint is no less invalid because a speaker has ignored the government's unconstitutional command.

There are different types of sanctions with quite different consequences for a constitutional inquiry. The sanction which

---

**10.** In *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394 (1985), the Supreme Court appears to create an anomalous exception to the substantial overbreadth doctrine by intimating that a person who prevails on an "as applied" challenge cannot attack the statute on its face as substantially overbroad. The passage obscures the point that substantial overbreadth is not a standing notion but, rather, a question of severability. Keeping one's eyes on the question of severability will help to keep this confusing area of law well-ordered. *See generally* Monaghan, *Overbreadth*, 1981 Sup.Ct.Rev. 1.

flows from a failure to receive prior clearance is a sanction which attempts to enforce a prior restraint. In contrast, the type of sanction which flows from the content of speaking forbidden words is in constitutional terms referred to as an after-the-fact (of speaking the forbidden words) sanction. An illustration may be helpful to delineate the differences I discuss. The ordinance in *Lovell v. Griffin*, 303 U.S. 444, 447, 58 S.Ct. 666, 667, 82 L.Ed. 949 (1938) stated:

> Section 1. That the practice of distributing, either by hand or otherwise, circulars, handbooks, advertising, or literature of any kind ... within the limits of the City of Griffin, without first obtaining written permission from the City Manager of the City of Griffin, such practice shall be deemed a nuisance, and punishable as an offense against the City of Griffin.

Ms. Alma Lovell did not seek permission to distribute her pamphlets or magazines because "she regarded herself as sent 'by Jehovah to do His work' and that such an application would have been 'an act of disobedience to His Commandment.'" *Lovell* at 448, 58 S.Ct. at 667. She was found guilty of violating the above quoted statute and sanctioned accordingly.

The Supreme Court reversed her conviction because the ordinance was a prior restraint, void on its face. The character of the ordinance is "such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship.... While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the constitutional provision. [citations omitted]. Legislation of this type of the ordinance in question would restore the system of license and censorship in its boldest form." *Lovell* at 451–52, 58 S.Ct. at 669. The

"sanction" Ms. Lovell received was not an after-the-fact sanction. Ms. Lovell's receipt of a sanction did not change the character of the prior restraint into something else. Her punishment was a sanction flowing from an unconstitutional prior restraint.

To decide whether a rule is a prior restraint, one should examine the rule from the viewpoint of the speaker. Constitutional jurisprudence envisions two basic types of prior restraint. For the first type, one should ask, does the speaker have to obtain clearance or permission to speak? If so, then the rule constitutes the classic prior restraint—a restraint which subjects a speaker to a pre-clearance censor. *See Lovell v. Griffin*, 303 U.S. 444, 451–52, 58 S.Ct. 666, 668–69, 82 L.Ed. 949 (1938). There is also another kind of prior restraint: the injunction which has the effect of gagging a speaker. This second type of prior restraint, which does not encompass the entire scope of prior restraints, is also treated as a prior restraint because of its effect. The type of prior restraint primarily involved in this case is the first type—a restraint which screens a speaker's speech before the words are spoken. As I discuss below in Part D(1), the sanction a speaker receives for disobeying the strictures of the system of censorship does not transform the restraint into an after-the-fact sanction.

As an example, imagine that the Kilgore Rule reads:

> Refrain from furnishing information relative to department policy, practices, or business affairs.

The removal of the concluding phrase "except as authorized by the Chief of the Department" transforms this prior restraint into a total blackout of nearly all speech. This blanket prohibition, while it suffers from other constitutional infirmities,[11] would not be a prior restraint. No censor screens the proposed speech. *See also City of Lakewood v. Plain Dealer*

---

**11.** Shutting off all speech is not constitutionally permissible. The First Amendment needs room to breathe. *See Airport Commissioners of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 107 S.Ct. 2568, 2572–73, 96 L.Ed.2d 500 (1987). And a broad, vague statute will not suffice because a

vague rule invites prosecutorial abuse, and because the Due Process Clause protects a person from punishment when the person did not receive adequate notice of the proscribed conduct. *See Jews for Jesus*, 107 S.Ct. at 2573.

*Publishing Co.,* — U.S. ——, 108 S.Ct. 2138, 2142, 100 L.Ed.2d 771 (1988) (newspaper had not yet placed its proposed racks on city sidewalks, but instead sought an order from the court enjoining the utilization of the ordinance before requesting a permit). If the City of Kilgore went to court and received an injunction to stop an employee from speaking at an upcoming event, then the injunction enforcing the rule would be the second type of prior restraint—the gagged speaker restraint. The success ratio of the government in restraining speech is not, however, a crucial distinction, only a mere reminder that prior restraints do succeed in preventing speech from flowing.

*Saia v. New York,* 334 U.S. 558, 558–60, 68 S.Ct. 1148, 1148–50, 92 L.Ed. 1574 (1945), is another example of a screening-type prior restraint. The speaker, a minister, was a Jehovah's Witness. The City of Lockport, New York, had an ordinance which forbade the use of sound amplification devices except with the permission of the Chief of Police. The speaker obtained permission to use sound trucks to amplify lectures on religious subjects. When this permit expired, the speaker "applied for another one but was refused on the grounds that complaints had been made." [The speaker] nevertheless used his equipment as planned on four occassions, but without a permit." *Saia* at 559, 68 S.Ct. at 1149. The speaker was tried and convicted for his violation of the ordinance.

The Supreme Court held the ordinance unconstitutional on its face because it established a prior "restraint on the right of free speech...." *Saia,* 334 U.S. at 560, 68 S.Ct. at 1149. "To use a loud-speaker or amplifier one has to get a permit from the Chief of Police." *Id.* The fact that one's speech is actually disseminated does not turn a prior restraint into an after-the-fact sanction.

The crucial examination focuses on what the speaker must do or cannot do as viewed from the speaker's viewpoint.[12] If the speaker must seek permission or review before speaking, then the system is a screening-type prior restraint. Of course, the fact that a rule is a prior restraint does not mean that the rule is per se unconstitutional. However, understanding how the rule functions is a very important threshold step for navigating the swirling waters surrounding any discussion of the First Amendment.

### D. Kilgore's Prior Restraint—Invalid in All Applications

In this case, several steps are involved in the constitutional inquiry. First, is Kilgore's Rule a prior restraint? I believe Kilgore's Rule is a prior restraint, and the majority incorrectly characterizes the Rule as an after-the-fact sanction in this case. Second, I will examine why this plaintiff should be able to challenge the Rule on its face. Finally, and most importantly, I will explain why this court is constitutionally compelled to consider this facial challenge: the Rule is invalid in all its applications. Thus, we should consider Moore's facial challenge, and we should find the Rule unconstitutional on its face.

### 1. Is Kilgore's Rule a Prior Restraint?

Aware of—perhaps steeped in—the values guiding our First Amendment inquiry, and the framework of parallel threads that are all too often hopelessly tangled, one may properly analyze the facial difficulties of Kilgore's Rule. The first step, in deciding whether Moore can attack facially the Rule and prevail, is to decide how the Rule operates. Is the Rule a prior restraint? Is the Rule an after-the-fact sanction as the phrase is understood constitutionally?

It is usually best at first to examine closely the content of the Rule in controversy. The Rule states:

> Refrain from furnishing information relative to department policy, practices, or business affairs except as authorized by the Chief of the Department.

---

12. See further discussion in Part D(1) for the difference between the internal viewpoint—examination conducted from inside the speaker's shoes—and the external viewpoint—looking from the outside at the effect of a rule.

On its face, this Rule primarily operates as a prior restraint. The word "refrain" directs a Kilgore firefighter not to speak. The content of the speech prohibition reaches to all information relative to department policy, practices, or business affairs—an extremely broad sweep concerning the type of speech involved. Consequently, a firefighter cannot speak about anything which touches upon the fire department's affairs. If a firefigher wants to speak to anyone—about, for example, a particular method of staffing a firehouse—the firefighter must go to the Chief with the proposed speech and receive the Chief's blessing—authorization—before the firefighter may utter a single syllable. The Rule gives the Chief the right not to authorize the proposed speech. Thus, the Chief can gag the firefighter before the words are spoken. No guidelines of any sort, except the scope of the content of the speech itself ("information relative to department policy, practices, or business affairs"), put a brake on the discretion of the supervisory official. Room for absolute discretionary censorship is inherent in the structure of the Rule.

The majority opinion does not think this Rule is a prior restraint. The majority asserts that the "department does not pretend to have authority to gag its employees before they speak. It claims the right to fire, demote, or suspend them after they speak. That is not a prior restraint; it is an after-the-fact sanction."

I fundamentally disagree with the majority's asserted distinction for two reasons. First, the majority's assertion is not supported by the factual record. The City does believe that it may sanction its firefighters for failing to receive clearance for any proposed speech. The December 31, 1985, memorandum from the City Manager, Ron Cox, to Moore states that "[b]oth Chief Duckworth and I directed you to say as little as possible and not discuss the events surrounding the fire.... You had stated you would say no more than what we had discussed and agreed upon.... You have been supplied with a copy of the Fire Department Rules and Regulations and are expected to know what those rules

and regulations are ... *you were directed verbally to refrain from any discussion of the events surrounding the fire.* This flagrant insubordination cannot and will not be tolerated. As a result, disciplinary action must be taken.... Mr. Moore, I remind you again that you are an employee of this City. *There will be no more public announcments, (sic) by you regarding your opinion of any policies or directives issued by this City."* (emphasis added).

The City Manager's understanding of the Rule is that he has the authority to order an employee not to speak in the future. The City Manager also believes that the Rule operates to keep employees from speaking unless they obtain permission.

My second disagreement concerning the majority's characterization of the Rule is that the majority treats the existence of a sanction on these facts as inherently distinct from the evil of a gag. The majority believes that if a person is sanctioned, one is necessarily left with the conclusion that the regulation operates as an "after-the-fact sanction." However, as I have discussed in Part C(2) *supra,* the majority fails to distinguish between two different types of sanctions and erroneously treats both as encompassing the constitutional idea of an after-the-fact sanction. Under the Kilgore rule, a firefighter who speaks without the Chief's blessing can be sanctioned for two distinct reasons: the failure to receive prior clearance; and the failure to speak acceptable words. The majority's conflation of these two different ideas leads to the mistaken legal conclusion if an offending employee is penalized "after-the-fact" that necessarily means that the rule is not a prior restraint. The sanction that flows from a failure to receive prior clearance is a sanction which attempts to enforce a prior restraint. But such a prior restraint-sanction is not, in the constitutional sense, an after-the-fact sanction. The majority errs in its characterization of the Kilgore Rule because it fails to identify the source of the sanction—a prior restraint. All of the majority's resulting errors flow from this one threshold error: the conflation of an after-the-fact sanction with a

prior restraint sanction. A government's discretionary ability to apply a prior restraint is no less undesirable because the speaker has, at his or her own peril, ignored the government's dictates.

The crucial examination which leads to my result that Kilgore's Rule is a prior restraint focuses on what the speaker must do or cannot do as viewed from the speaker's viewpoint. *Standing in the shoes* of the potential speaker, (the internal viewpoint), one sees that the Kilgore Rule directs Moore, or any other Fire Department employee, to seek the Chief's approval before speaking. There are no guidelines for the Chief to apply to decide what to authorize and what not to authorize. In this situation, the Chief has the opportunity to act as a censor of the viewpoints of the fire department's employees. If the speaker must seek permission or review before speaking, then the system is a prior restraint. Of course, the fact that a rule is a prior restraint does not mean that the rule is *per se* unconstitutional.

If viewed from the speaker's viewpoint, a court decides that a speaker does not have to receive prior permission, only then should the court adopt the external viewpoint and ask the second question of whether speech is, in fact, gagged. If speech is gagged, the gag is also a prior restraint. But in analytical terms, this type of prior restraint is distinct from the clearance-type of prior restraint which looks at the rule from the speaker's viewpoint. *See* discussion in Part C–2.

Again, the majority errs in believing that the second type of prior restraint—the gagged speech—is the only type of prior restraint. Kilgore' Rule, on its face, is a screening-type of prior restraint.

### 2. Can This Plaintiff Complain of the Rule's Facial Invalidity?

As I have stated, the City of Kilgore enforced its prior restraint. Moore was, in part, punished for disobeying the mandate of the restraint. He was also punished for the content of his speech. He has been vindicated in Part I of this opinion for the application of the rule to the content of his speech. Moore also seeks vindication for his being subject to a screening device which has the potential to suppress undesirable speech.

Thus, because the Rule on its face operates as a prior restraint, and because the sanctioning of Moore manifests the evil contained in the Rule's prior restraint character, we are left with one question: whether Moore, who has prevailed upon his contention that the Rule was unconstitutionally applied to him, can attack the Rule on its face as an unconstitutional prior restraint. *See generally* Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 244 (1988). The majority finds that Moore has received all the relief due him, and therefore he can only challenge the Kilgore Rule on the ground of overbreadth as applied to him and not to any third parties. I disagree.

If this court does not entertain Moore's facial challenge, Kilgore's Rule will continue in force. We should, therefore, inquire into what happens if this court permits this prior restraint to stand. To accomplish this inquiry, it is necessary to see how this prior restraint affects the First Amendment's underlying values.

The existence of Kilgore's Rule threatens at least three of the values that undergird the First Amendment: truth, knowledge, and tolerance. One must create two categories of cases to see the effect of a prior restraint on the three stated values. The first category of prior restraints, which the majority believes is the only category, encompasses a situation in which the prior restraint is successful—the speech is gagged. This situation exists here not from the face of the Rule, but from the City's directive to Moore implementing the Rule. Moore has been directed not to speak about any public matters from the time of the directive into eternity. When speech is gagged, as the directive now has the effect of achieving, the words do not go forth. The public does not receive information, so the public is denied the opportunity to judge the truth of the speech, and is deprived of useful knowledge necessary to be able to make informed decisions. In

addition, the effect of such a prior restraint is to introduce the probability of censorship by the supervisory official. *See Lovell v. Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). Especially with a prior restraint such as Kilgore's, which has no guidelines, the restraining discretion serves as a "device for the suppression of the communication of ideas and permits the official to act as a censor." *Cox v. Louisiana*, 379 U.S. 536, 557, 85 S.Ct. 453, 465, 13 L.Ed.2d 471 (1965). Censorship distorts the dissemination of truth and knowledge to conform with the official's vision of truth and knowledge.

A successful restraint also indulges the worst tendencies of intolerance found in all of us including the governmental official. Moore's speech presents the archetypical example. His speech was critical of the fire department's handling of a fire. This criticism upset the department. The supervisory official, the City Manager, punished Moore both for his speech and directed him not to speak anymore. Tolerance was hardly the watchword for the City of Kilgore's actions.

Since Moore bypassed the prior restraint established on the face of the Rule and went ahead and spoke out about the handling of the December 26 fire (although the City has succeeded in placing a blanket prohibition for all future speech to which Moore feels bound), does the Rule still have deleterious effects on the First Amendment? The restraint's chilling effects and problems of proof supply the answer. To bypass a prior restraint requires tremendous verve from the speaker; foolhardiness is another way of stating the same thing, for the speaker must risk receiving a sanction not for the speech expressed but for ignoring the screening procedure. Verve is not, however, a constitutional requirement. Courts and scholars usually express this idea as the "chilling effect" of a prior restraint. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). In constitutional terms, the speech of the timorous is as important as the words of the bold. The First Amendment must therefore protect equally the fearless and the shy. In re-

gard to free speech values, chilled speech also results, like suppressed speech, in a loss of truth, knowledge and tolerance. We should treat similarly the two categories of prior restraints.

Because of the tremendously harmful effects a prior restraint can have on our system of free speech, " '[a]ny system of prior restraints of expression comes to [the court] bearing a heavy presumption against its constitutional validity.' *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963); *see also Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). The Government 'thus carries a heavy burden of showing justification for the imposition of such a restraint.' *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971)." *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (Pentagon Papers) (per curiam).

3. Constitutional Imperative to Consider Facial Challenge When Rule is Invalid in All its Applications.

Because of a prior restraint's effects on First Amendment values and the heavy presumption of invalidity a prior restraint bears, the constitution commands us to grant this plaintiff standing to hear his facial challenge in this situation because the restraint is invalid in all its applications.

The majority errs when it analyzes the Kilgore Rule only in terms of the substantial overbreadth doctrine. This error flows from the majority's mischaracterization of the Rule as an after-the-fact sanction. If the majority were to recognize that this Rule is a prior restraint, then the majority would be constitutionally compelled to examine the Rule, not under the substantial overbreadth doctrine, but under the *Lakewood–Munson–Vincent* line of cases. *See City of Lakewood v. Plain Dealer Publishing Co.*, —— U.S. ——, 108 S.Ct. 2138, 2143–45, 100 L.Ed.2d 771 (1988); *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 962, 104 S.Ct. 2839, 2849,

2851–52 n. 13, 81 L.Ed.2d 786 (1984); *Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796–97, 104 S.Ct. 2118, 2124–25, 80 L.Ed.2d 772 (1984). *See* discussion in Part C(2) *supra.*

Is Kilgore's prior restraint invalid in all applications? The district court believed that this prior restraint was permissible " '[f]or a variety of reasons, including safety and security, this is an area of legitimate government interest to control, or at least monitor, statements made by employees on possibly confidential or sensitive matters to prevent indiscrete disclosures." The majority takes a narrower view of what constitutionally could be restrained— "[e]mployers will have to act as spokespeople. Speech that would be damaging to the department if made without supervisory approval may be essential to the department if made with approval."

The majority raises an interesting question about a governmental employer managing its own speech. There are certainly times a governmental body must utilize a spokesperson to communicate an "official" message to either the public or the members of the institution. Such speech often involves prior approval by supervisors to be sure the correct message is being communicated. The majority is correct that some sort of prior restraint could, hypothetically, be a legitimate restriction. Hypothetical interests are not, however, constitutionally sufficient. The test for a constitutional speech restriction is whether the restriction is narrowly tailored to serve a *proven compelling governmental interest. Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 104 S.Ct. 2839, 2849, 81 L.Ed.2d 786 (1984); *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971) (governmental interest must be proved in the record).

Kilgore, as a matter of evidence, has not presented proof of a compelling governmental interest—except possibly one interest: the release of information relating to an arson investigation. The interest in controlling spokespersons is not supported in the record. *See Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971). Therefore we cannot consider it.

Premature release of an arson suspect's name, and crucial and unique details concerning an arson fire would likely constitute compelling governmental interests. These governmental interests are supported in the record. However, a compelling government interest is only half of the inquiry. *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 104 S.Ct. 2839, 2849, 81 L.Ed.2d 786 (1984); *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980). Narrowness and specificity, which provide notice to potential speakers, are the touchstones of a constitutional prior restriction. *See Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 183–84, 89 S.Ct. 347, 352–53, 21 L.Ed.2d 325 (1968). Narrowness which is carefully tailored to the compelling interest must be present. Otherwise, the Rule is unconstitutional in every application. Nothing about the Kilgore Rule is narrow. The Rule covers release of any information relevant to department policy, practices, or business affairs. Most anything is "relevant" if it even approaches the subject matter. *See generally* Fed.R.Evid. 401.

Kilgore's Rule does not limit prior clearance to details of an arson investigation. The Rule does not place durational limits on the clearance feature; presumably, fifteen years after the closure of an arson investigation and conviction, a firefighter would still need prior clearance to comply with the Rule. The record is completely devoid of evidence that Kilgore has narrowing guidelines which relate directly to the proven compelling government interest. Without narrow guidelines, the discretion of the City is unconstitutionally boundless. Because the Rule is without guidelines, it could never be applied constitutionally, even if the speech involved details of an arson fire. The inherent censorship quality of this Rule dooms its every application to

unconstitutional death. Kilgore's vision of narrowness is akin to a venture to catch one salmon in the ocean by using 1000 yards of netting at the mouth of a river in salmon season. Such a knotted webbing nets not only the one needed, sought-after salmon, but an entire school suffers from the sweeping endeavor.

The fatal flaw in Kilgore's Rule is the lack of standards limiting the discretion of a supervising official. *See City of Lakewood v. Plain Dealer Pub. Co.*, ―― U.S. ――, 108 S.Ct. 2138, 2144–45, 100 L.Ed.2d 771 (1988). Without guidelines, a reviewing court cannot adequately and easily determine whether the censor suppressed the speech for legitimate or illegitimate reasons. *Id.* 108 S.Ct. at 2144. "Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, post hoc rationalizations by the licensing officials and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *City of Lakewood* 108 S.Ct. at 2144; *see also Freedman v. State of Maryland*, 380 U.S. 51, 85 S.Ct. 734, 739–40, 13 L.Ed.2d 649 (1965).

It is the lack of narrow standards, expressing proven, compelling governmental interests, that makes this prior restraint unconstitutional in all conceivable applications. "It is when statutes threaten [the risks of unbridled censorship schemes— self-censorship by speakers in order to avoid being denied a license to speak, and the difficulty of effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the censor's action—] to a significant degree that courts must enter-

tain an immediate facial attack on the law." *City of Lakewood* 108 S.Ct. at 2145 (emphasis added). As the Kilgore Rule is written, there is no valid application. Therefore the majority is correct that the substantial overbreadth doctrine offers no avenue of relief for Moore. The generic notion, however, of a statute's ambit sweeping too far—descriptive overbreadth— should offer relief to Moore because the Rule constitutes an unconstitutional prior restraint.

### Conclusion

Citizens care deeply about the ability of their local fire department to fight fires effectively. In the long term interests of the City's people, Moore's speech will help produce a fire department that is increasingly responsive to the needs of the citizenry. If the necessity for a responsive department were not of universal concern, then the citizens of Kilgore, Texas, would live in fear of a horrible holocaust. Within memory's distance of nearby New London, Texas,[13] the people of Kilgore have a right to know how effective their fire department is and how ready it is to battle a potentially tragic blaze.

Moore spoke out concerning a matter of great public concern. In return for his valuable speech, the City disciplined him. Under the *Pickering/Connick* balancing test, we conclude that Moore's speech falls on the weighted side of the balance and is constitutionally protected under the First Amendment. Thus, the City cannot constitutionally punish Moore for his speech. We reverse the district court on this ground and remand for a trial on the issue of appropriate relief.

The majority affirms the district court's holding that the Kilgore Rule is facially constitutional. I disagree.

We should entertain Moore's facial attack and strike down the Kilgore Rule as

**13.** On March 18, 1937, an explosion occurred and fire engulfed an elementary school in New London, Texas. Casinghead gas had, presumably, accumulated in the basement. There were conflicting reasons given for what actually set off the explosion. As a result of the fire, 280 children and 14 adults died. The elementary school district reached beyond the boundaries of the little town of New London with its population of under 2000 people. In the history of a region, such a tragedy is not soon forgotten. *See* J. Clark & M. Halbouty, The Last Boom 253–57 (1972).

an unconstitutional prior restraint. I must say, I realize that the differences between the majority's view of this case and my view of this case is essentially a disagreement about the role of the judiciary. In this case, we have a person who has been injured by the sweep of an unconstitutional Rule and remedied for the unconstitutional application. But it would be hard to imagine a case which presents the issue of the facial viability of the Kilgore Rule more adroitly than Moore's case. I believe we must take every legitimate opportunity to assure the continued vitality of the First Amendment's exalted position in our "concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937) (Cardozo, J.), by pretermitting, if possible, infringements upon the First Amendment. I think the majority errs when it does not confront head-on the evil of censorship presented by Kilgore's Rule. For these reasons, I dissent from Part II of the Court's opinion.

HIGGINBOTHAM, Circuit Judge, with whom DAVIS, Circuit Judge, joins:

### I

We agree that, for the reasons stated in Judge Goldberg's opinion, the Kilgore fire department rule was unconstitutionally applied to appellant Moore.

### II

■ Moore contends that Kilgore Fire Department Rule 4.2A(40) is unconstitutional not only as applied in this case, but facially. We need not entertain this argument. Our holding that the rule was unconstitutionally applied entitles Moore to all relief due him. Because Moore's conduct was constitutionally protected, Moore is entitled to the job benefits which the City denied him on the basis of that conduct. Likewise, and for the same reason, the City may not apply its rule in the future to prohibit the sort of policy criticisms which precipitated this suit.

■ In short, the City must give back what it took away from Moore, and the City cannot impose any similar penalty on his speech in the future. More than this has not been demanded, and more than this we cannot give. Having found that the statute was unconstitutionally applied, there is no need to consider a facial attack.

This conclusion is entirely consistent with the rationales underlying the First Amendment doctrines pertaining to facial unconstitutionality. In his briefs to this Court, Moore footed his facial challenge to the Fire Department Rule entirely upon grounds of overbreadth. The overbreadth doctrine permits plaintiffs whose own conduct is not constitutionally protected to assert the rights of third parties whose protected speech might be chilled by the statute or rule under consideration. "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties *not before the Court* for it to be facially challenged on overbreadth grounds." *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 2125–26, 80 S.Ct. 772 (1984) (emphasis added).

Yet Moore makes no attempt to assert the rights of third parties not before us. Instead, his claim, made quite explicitly by his briefs, is that the statute is overbroad precisely because it applies to him—the plaintiff who *is* before us. As the Supreme Court has held in similar circumstances, "[t]his is not … an appropriate case to entertain a facial challenge based on overbreadth. For we have found nothing in the record to indicate that the ordinance will have any different impact on any third parties' interests in free speech than it has on [Moore]." 104 S.Ct. at 2127. The reasoning of *Taxpayers for Vincent* does not permit us to make an overbreadth inquiry here. *Accord, Street v. New York*, 394 U.S. 576, 581, 89 S.Ct. 1354, 1360, 22 L.Ed. 2d 572 (1969) (declining, in an opinion for the Court by Justice Harlan, to reach facial challenges to the statute because the statute was unconstitutionally applied).

There are good reasons for such a restriction. The overbreadth doctrine is an "exception to ordinary standing require-

ments," and it must be carefully construed lest it "swallow the general rule." 104 S.Ct. at 2126. Because the doctrine is "strong medicine," it "has been employed by the Court sparingly and only as a last resort." *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). We need not here proceed to last resorts, because the case has been disposed of on the basis of the Rule's application to the plaintiff before us.

Were we in fact to ignore *Taxpayers for Vincent,* and proceed to consider the overbreadth question, we would immediately find ourselves immersed in inquiries so speculative as to border upon the metaphysical. For example, a holding that the Fire Department Rule is facially unconstitutional, because overbroad, would forbid "any enforcement" of the rule "until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Broadrick,* 413 U.S. at 613, 93 S.Ct. at 2916. The holding would not, in other words, merely prohibit application of Rule 4.2A(40) to political criticisms like those made by Moore—a prohibition which, in any event, follows from our decision that the Rule was unconstitutionally applied. The overbreadth holding would also forbid application of the rule to conduct which the employer clearly does have the authority to punish, such as, for example, spreading malicious gossip about fire department employees.

The Supreme Court, however, held in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) that an employer may constitutionally punish this sort of speech even in the absence of any rule. The Court in that case upheld the employee's discharge even though the employee "did not violate announced office policy" at all. 103 S.Ct. at 1693 & n. 14. Could Kilgore therefore continue to punish all conduct within the legitimate sweep of Rule 4.2A(40), even if we held the rule overbroad, so long as Kilgore relied upon its general, discretionary authority to discipline employees, rather than upon the rule? Would the case turn upon whether Kilgore cited the rule? Or would Kilgore's discre-

tion to discipline its employees be eliminated entirely by a defective attempt to channel that discretion? All of these results appear absurd.

Even to reach these abstract ruminations we must undertake another set of speculative gymnastics. The overbreadth doctrine will not invalidate a statute or rule unless its overbreadth is "not only ... real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick,* 104 S.Ct. at 2126. Certainly here the Kilgore Rule sweeps *too* far, since, as construed by the City, it encompasses Moore's conduct, which we have held constitutionally protected. The overbreadth is thus real, but that does not prove it substantial. In order to discover whether it was, we would have to hypothesize both the legitimate and the illegitimate applications, and somehow compare the two.

The statute certainly has a significant and lawful core application. As the *Connick* Court indicated, we must respect the government's legitimate interest in regulating the speech of its employees concerning matters related to their employment. The *Connick* Court recognized the importance of this interest. The Court quoted with approval Justice Powell's observation that

> To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.

*Connick,* 103 S.Ct. at 1692, *quoting Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (Powell, J., concurring). This circuit has long recognized—even before the Supreme Court reversed our own disposition of *Connick* —that it would be unwise "to circumscribe narrowly [a public employer's] discretion in

promoting the ends of 'discipline, esprit de corps, and uniformity' among his ... officers." *Barrett v. Thomas,* 649 F.2d 1193, 1198 (5th Cir.1981) (Pre–*Connick* case), *quoting Kelley v. Johnson,* 425 U.S. 238, 246, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976).

A fire department must have the authority to sanction its workers for releasing confidential facts that will compromise ongoing investigations or business negotiations; for spreading malicious gossip about co-workers; for misrepresenting departmental positions; for lying; or for acting without permission as official spokespeople for the department.

The comparison between these legitimate applications of Rule 4.2A(40) and its illegitimate applications would be highly speculative. Fortunately, under the rule of *Taxpayers for Vincent,* we need not pursue that inquiry.

This case does not implicate at all a second line of cases, a line which holds certain statutes facially unconstitutional not because of overbreadth but because they vest officials with unfettered discretion to censor what speech they choose. *See City of Lakewood v. Plain Dealer Publishing Co.,* — U.S. —, 108 S.Ct. 2138, 2150–52, 100 L.Ed.2d 771 (1988); *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Cox v. Louisiana,* 379 U.S. 536, 557, 85 S.Ct. 453, 465, 13 L.Ed.2d 471 (1965); *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). Moore himself quite clearly phrases his facial challenge to the rule as an overbreadth challenge. No "unfettered discretion" argument has been properly made to this court.

■ In any event, the "unfettered discretion" cases deal with instances in which "a holding of facial invalidity expresses the conclusion that the statute could never be applied in a valid manner." *Taxpayers for Vincent,* 104 S.Ct. at 2125. Those cases are inapplicable here. Kilgore's rule clearly does, as already explained, have valid applications.

■ Those valid applications remain even though the rule leaves discretion to the public employer. As *Connick* made clear, the employer may discharge employees for their speech even in the absence of any announced policy. Certainly the absence of a policy permits the employer substantial discretion. The employer's adoption of an office policy, notifying employees of how the employer intends to use its discretion, does not require the employer to abandon its discretion.

■ Nor, finally, is the rule a prior restraint. The department does not pretend to have authority to gag its employees before they speak. It claims the right to fire, demote, or suspend them after they speak. That is not a prior restraint; it is an after-the-fact sanction. The Kilgore fire department is not proposing to do anything that is analogous to shutting down the presses, as the government sought to do in *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), and *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Nor does the Kilgore rule authorize police to interrupt speech in progress, as happens when a city rule allows police officers to disperse a demonstration or to muffle a loudspeaker.

True, the City did ask its employees to seek permission *before* they spoke. But offending employees are penalized after-the-fact, by the loss of their jobs. They are not gagged or subjected to an injunction. Demotion and suspension was the fate suffered by Moore, and the event that precipitated this suit. Kilgore did not stop him from getting his message out.

■ The difference is crucial. The great evil of a prior restraint is that it prevents the public from receiving the information possessed by the gagged speaker, and so from judging the information's worth and the speaker's case. If a sanction is instead applied after-the-fact, angry voters may vindicate the speaker's rights, by removing from office those who imposed the sanction. Prior restraints are constitutionally suspect because they deprive speakers of recourse to the people, who are inevitably the ultimate, and the

most important, protector of justice in American politics.

These concerns are not implicated by Kilgore's rule. And, indeed, it is difficult to see how any government employer could regulate speech without, more or less directly, carving out an exception for speech approved by the employer. Employees will sometimes have to act as spokespeople. Speech that would be damaging to the department if made without supervisory approval may be essential to the department if made with approval.

The Kilgore fire department's rule was applied unconstitutionally in this case. We need not go further to decide its facial constitutionality.