19 F.3d 1428
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Grady W. CONNOR, Plaintiff-Appellant,
v.
CITY of Hickory; Thomas F. Hardin, Former Chief, City of
Hickory Fire Department; B. Gary McGee, City Manager for
the City of Hickory; Jack Lindsay, Director of Personnel
for the City of Hickory; Floyd Lucas, Chief of Police for
the City of Hickory, Defendants-Appellees.
Tony W. LOWMAN, Plaintiff-Appellant,
v.
CITY of Hickory; Ted Ross Beshears, Deputy Fire Chief;
Thomas F. Hardin, Chief, City of Hickory Fire Department;
C. Freddie Hollar, Operations Chief; B. Gary McGee, City
Manager for the City of Hickory; Jack Lindsay, Director of
Personnel for the City of Hickory, Defendants-Appellees.
David Alexander PRUETT, Plaintiff-Appellant,
v.
CITY of Hickory; Ted Ross Beshears, Deputy Fire Chief;
Thomas F. Hardin, Chief, City of Hickory Fire Department;
C. Freddie Hollar, Operations Chief; B. Gary McGee, Manager
for the City of Hickory; Jack Lindsay, Director of
Personnel for the City of Hickory, Defendants-Appellees.
Donald R. TAYLOR, Plaintiff-Appellant,
v.
CITY of Hickory Fire Department; C. Freddie Hollar,
Operations Chief; B. Gary McGee, City Manager for the City
of Hickory; Jack Lindsay, Director of Personnel for the
City of Hickory, Defendants-Appellees.
Willie Alfred YODER, Plaintiff-Appellant,
v.
CITY of Hickory; Ted Ross Beshears; Thomas F. Hardin,
Chief, City of Hickory Fire Department; C. Freddie Hollar,
Operations Chief; B. Gary McGee, City Manager for the City
of Hickory; Jack Lindsay, Director of Personnel for the
City of Hickory, Defendants-Appellees.
 Nos. 92-2379, 92-2380, 92-2381, 92-2382, 92-2383.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 7, 1993
March 9, 1994.
 
 Appeals from the United States District Court for the Western District of North Carolina, at Statesville. Graham C. Mullen, District Judge. (CA-90-104-MU, CA-90-105-MU, CA-90-106-MU, CA-90-108-MU, CA-90-109-MU)
 C. Gary Triggs, C. Gary Triggs, P.A., Morganton, NC, for Appellants.
 John Thompson ALLRED, Petree, Stockton, Charlotte, NC; James Redfern Morgan, Jr., Womble, Caryle, Sandridge & Rice, Winston-Salem, NC, for Appellees.
 Anne E. Essaye, Petree, Stockton, Charlotte, NC; Allan R. Gitter, Womble, Caryle, Sandridge & Rice, Winston-Salem, NC; Eloise D. Bradshaw, Patrick, Harper & Dixon, Hickory, NC, for Appellees.
 W.D.N.C.
 AFFIRMED.
 Before LUTTIG and MICHAEL, Circuit Judges, and KEELEY, United States District Judge for the Northern District of West Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 This is a consolidated appeal from the district court's grant of summary judgment in favor of the appellees on the appellants' 42 U.S.C. Sec. 1983 and state law claims. Finding no error, we affirm the judgment of the district court.
 
 I.
 
 2
 In contrast to the legal issues involved, the facts of this case are colorful and complicated, arising from a brouhaha in the Fire Department of Hickory, North Carolina. Four of the appellants--Tony W. Lowman, David Alexander Pruett, Donald R. Taylor, and Willie Alfred Yoder--were, up until September 1989, employed by the Department in various capacities. The fifth, Grady W. Connor, is a private investigator whom Lowman hired after he was terminated by the Department on September 12, 1989. The appellees are officials of the City of Hickory--its former fire chief, Thomas F. Hardin; its deputy fire chief, Ted Ross Beshears; its fire operations chief, C. Freddie Hollar; its police chief, Floyd Lucas; its personnel director, Jack Lindsay; its city manager, B. Gary McGee--and the City of Hickory itself.
 
 
 3
 On January 2, 1983, Taylor met Hollar at the scene of a fire. Hollar, who was off-duty at the time, did not participate in fighting the fire, but arrived as operations were ongoing. Taylor allegedly smelled alcohol on Hollar's breath. Shortly after the fire, allegations were made that certain firemen were intoxicated that evening; because two persons had died in the blaze, the Hickory police department conducted an investigation. Although fifty-three persons were interviewed, no one--Taylor included--implicated Hollar, and the police finally concluded that the charges of drinking were unfounded. Sometime in 1984, however, Taylor privately told Lowman--who had not been on duty at the time of the fire and who had not been present at the fire scene--that he had lied to the police, and that he had in fact smelled alcohol on Hollar's breath.
 
 
 4
 The next major development in the case did not occur until January 1989, some time after Chief Hardin promoted Hollar to the position of Operations Chief. At this point, Lowman decided to tell Chief Hardin what Taylor had told him well over four years before. Lowman claimed to be revealing this information "out of friendship" and said that he was "simply passing on information[he] thought [he] was obligated to." He also claimed to have told Hardin that the information was "confidential." Deciding to investigate the matter, Chief Hardin asked Hollar if there was any truth to Lowman's allegation. After denying that he had been drinking, Hollar filed a formal written grievance against Lowman in early September 1989, stating that Lowman's "false and vicious accusations" were threatening his career. During this time, too, Chief Hardin learned that Lowman had told his story to other Hickory firemen in private conversations. On September 11, Lowman was called in for a meeting with Chief Hardin and Hollar and was presented with Hollar's grievance. Chief Hardin told Lowman that if he did not change his story he would be terminated, and gave him twenty-four hours to think it over. Lowman did not agree to change his story, and Chief Hardin dismissed him. Lowman then appealed his dismissal to McGee, who as City Manager was charged with reviewing termination decisions. After meeting with Lowman, McGee upheld Chief Hardin's decision.
 
 
 5
 On September 13, Taylor was asked to a meeting with Chief Hardin, Hollar, and Beshears. Chief Hardin told Taylor that Lowman had just been fired for spreading a story about Hollar's intoxication, and that if Taylor supported that story, he would be fired too. Taylor was then asked to leave the meeting for a few minutes. When he returned, Chief Hardin was not there, and after a brief discussion, Taylor left the meeting to go on vacation, stating that when he came back, he would ask Chief Hardin if he still had a job. When Taylor returned from vacation, Chief Hardin told him that he still had a job with the department. After returning to work, however, Taylor found that his co-workers were treating him differently,"shunning" and avoiding him. After nine shifts of such treatment, Taylor resigned and took a job with the fire department in the nearby town of Long View.
 
 
 6
 At roughly this time, too, Pruett was transferred from his position as a Fire Captain on shift duty to the Fire Marshal's Office, in which capacity he would have to conduct fire inspections. More importantly from Pruett's perspective, he could no longer work"shift" hours--i.e. twenty-four hours on duty followed by forty-eight hours off duty--which allowed him to pursue additional employment, but rather had to be on the job every day during normal business hours. Pruett met with Chief Hardin several times to voice his opposition to the transfer, but Chief Hardin refused to reconsider it. After Pruett's last meeting, he was asked by several co-employees how his discussions had gone; Pruett replied: "It didn't go no good; I ought to shoot him." When Chief Hardin found out about the remark, he suspended Pruett for five days and called the police to investigate. When the suspension was over, Chief Hardin gave Pruett the option of resigning with benefits or being fired. Pruett chose the former option, and signed a formal agreement with Chief Hardin embodying the terms of the resignation.
 
 
 7
 On September 12, Chief Hardin told Yoder, who then held the position of Fire Marshal and served on Chief Hardin's staff, that they could no longer work together because of "trust" problems, and that Yoder had the choice of resigning or being fired. On September 18, Yoder turned in his resignation.
 
 
 8
 As for Grady Connor, he was hired by Lowman after Lowman's termination. Lowman told Connor that he thought that he had been fired because Chief Hardin was having an affair with his ex-girlfriend, Tonya Levan Kale, who was a dispatcher at the Fire Department, and that he wanted Connor to investigate the matter. Connor told Lowman that the investigation would cost between $5,000 and $7,000. In December 1989, Connor arranged a meeting with William Warren, another Hickory fireman. Connor told Warren that he was investigating Chief Hardin, and that he knew that Chief Hardin was having an affair with Kale. When Warren asked Connor what would stop the investigation, Connor replied that three things were necessary: Lowman had to be reinstated, the affair with Kale had to stop, and Lowman had to be reimbursed for the costs of the investigation.
 
 
 9
 After Warren told Chief Hardin what had happened, Hardin telephoned Connor and arranged a meeting. Believing, not unreasonably, that Connor was attempting to extort money from him, Hardin also contacted Police Chief Lucas and City Manager McGee. Chief Lucas had a subordinate look into North Carolina law to determine whether there was probable cause to believe that Connor was acting illegally. The subordinate concluded that there was probable cause, and hence Chief Hardin went to his meeting with Connor "wired" with a microphone. Connor repeated the conditions necessary to put an end to the investigation; he also stated that if the conditions were not met, a copy of his report would go to the news media and other interested parties. A second meeting then took place, at which Hardin offered Connor a partial cash payment. Connor did not accept the payment, saying that he would have to check with his clients. Connor did, however, reiterate his clients' prior conditions, including reimbursement of the investigation's costs, and he told Hardin that he would soon provide him with a draft agreement that could bring the investigation to a close.
 
 
 10
 Chief Lucas then arranged meetings with two North Carolina Deputy Attorneys General and with the local district attorney and chief criminal prosecutor; they all agreed that Connor was attempting to extort money from Chief Hardin. The Hickory Police Department prepared a search warrant, arrest warrant and supporting affidavits, which Catawba County Superior Court Judge Forrest Ferrell reviewed. Judge Ferrell believed that there was probable cause; the arrest and search warrants issued; and on February 9, 1990, Connor was arrested. However, a grand jury twice failed to indict Connor for extortion, and the charges were dropped.
 
 II.
 
 11
 Lowman, Taylor, Pruett and Yoder filed suit under 42 U.S.C. Sec. 1983, claiming that their constitutional rights had been violated because Chief Hardin had fired them or forced them to resign for exercising their First Amendment rights to free speech and association. They also alleged violations of the free speech protections of the North Carolina Constitution, malicious interference with contractual relations, and intentional infliction of emotional distress. Hickory officials were sued on a theory of supervisory liability in that they had failed to rein in Chief Hardin's allegedly illegal actions, and the City of Hickory was itself named a defendant on the ground that it had a policy of authorizing Chief Hardin's actions.
 
 
 12
 Connor, too, raised a host of issues in his complaint. He alleged false arrest under 42 U.S.C. Sec. 1983 and North Carolina law; malicious prosecution under 42 U.S.C. Sec. 1983 and North Carolina law; federal and state civil conspiracy; malicious interference with his employment contract with Lowman; and the negligent hiring of Chief Hardin by City Manager McGee and Personnel Director Lindsay.
 
 
 13
 The district court granted summary judgment for the defendants on all of the claims by the Hickory firefighters. It held that Lowman could not proceed with his First Amendment claim, stating that although he had been fired for his statements about Hollar's supposed intoxication, those statements were not on a matter of "public concern." J.A. at 348-50. The district court came to the same conclusion about the alleged speech of Taylor, Pruett, and Yoder, id. at 427-28,[1] and held that their claims were barred for the further reason that, as a matter of law, their resignations were made voluntarily and of their own free will. Id. at 422, 425, 431. With respect to Taylor, the court noted that his decision was made over the course of a three-week period and that he had admitted that he probably would have continued to work at the Hickory Fire Department if he had not been offered the position in Long View, where the hours were supposedly better. Id. at 420, 424. With respect to Pruett, it concluded that he had considered resigning during his suspension--that is, before Chief Hardin mentioned the subject at all--because he did not think he could work with Chief Hardin following his outburst. Id. at 418, 423. With respect to Yoder, it found that he had written a letter stating that his resignation was for personal reasons and that he had no ill-will towards anyone at the Department. Id. at 421.
 
 
 14
 On the state law issues, the district court rejected the firefighters' claims under the free speech provisions of the North Carolina Constitution, reasoning that its provisions were coextensive with those of the federal Constitution. Id. at 355, 437. It dismissed the firefighters' malicious interference of contract and intentional infliction of emotional distress claims as not supported by any evidence. Id. at 356-58, 438-440.[2]
 
 
 15
 The district court also granted the defendants' summary judgment motion on all of Connor's claims. It found that no genuine issue of material fact existed as to whether probable cause supported Connor's arrest, id. at 257, and that his malicious prosecution claim was barred because one of its necessary elements was a lack of probable cause. Id. at 258. It dismissed the civil conspiracy charges because a necessary condition for that cause of action was an unlawful act or the deprivation of a constitutional right, which Connor could not show. Id. at 259. The district court concluded that Connor had come forward with no evidence that Lowman had breached their contract to have Hardin investigated, nor, assuming that a breach had occurred, that the defendants had intentionally induced it, id. at 261. Finally, it stated that McGee and Lindsay could not be held liable under North Carolina law for mere negligence, as opposed to malice, in hiring Chief Hardin, because in doing so they were performing a governmental function requiring judgment and discretion. Id. at 262.
 
 III.
 
 16
 We are in general agreement with the extremely thorough opinions of the district court, and we affirm its judgments on the basis of those opinions. See Connor v. City of Hickory, et al., No. 5:90cv-104-MU (W.D.N.C. Sept. 24, 1992); Lowman v. City of Hickory, et al., No. 5:90cv-105-MU (W.D.N.C. Sept. 24, 1992); Pruett v. City of Hickory, et al., No. 5:90cv-106-MU (W.D.N.C. Sept. 24, 1992); Taylor v. City of Hickory, et al., No. 5:90cv-108-MU (W.D.N.C. Sept. 24, 1992); Yoder v. City of Hickory, et al., No. 5:90cv-109-MU (W.D.N.C. Sept. 24, 1992). However, we do believe that one issue in the case warrants at least brief discussion--namely, whether Lowman's speech was on a matter of public concern. In the end, we conclude that it was not, and we therefore hold that Lowman's claim was properly dismissed.
 
 
 17
 In Connick v. Myers, 461 U.S. 138 (1983), the Supreme Court stated that the first question to be resolved when a public employee claims that he has been discharged in violation of the First Amendment is whether the speech for which he was allegedly fired touches upon a matter of "public concern." See id. at 146. Distinguishing between situations in which "a public employee speaks ... as a citizen upon matters of public concern" and those in which he speaks "as an employee upon matters only of personal interest," id. at 147, the Court held that "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices." Id. at 146. Connick also held that the question of whether a public employee's speech addresses a matter of public concern is one of law, which a federal court must determine by looking at "the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48. Using this statement as a guide, we find that Lowman's speech in 1989 about Hollar's alleged intoxication in 1983 does not rise to the level of"public concern."
 
 
 18
 In other circumstances, the "content" of Lowman's speech might well allow it to qualify for First Amendment protection under Connick. The public certainly has an interest in knowing whether those persons entrusted with protecting its safety are performing their duties while intoxicated. See, e.g., Daniels v. Quinn, 801 F.2d 687, 690 (4th Cir.1986) ("[T]his circuit has held that matters of public concern ... must relate to wrongdoing or a breach of trust ...."); cf. Moore v. City of Kilgore, 877 F.2d 364, 369-72 (5th Cir.), cert. denied, 493 U.S. 1003 (1989) (stating that the public had an interest in knowing whether staffing shortages had prevented the local Fire Department from performing its duties). Moreover, back in 1983, allegations of firefighter intoxication were circulating in Hickory's public arena, as demonstrated by the fact that a police investigation on the subject was ordered.
 
 
 19
 In this case, however, the "content" of Lowman's speech is outweighed, for Connick purposes, by its "form" and "context." Lowman's speech took the form of private conversations with Chief Hardin and several other Hickory firefighters. Lowman himself learned of Hollar's alleged drunkenness in a private conversation with Taylor. Although private remarks are not, by that nature alone, unprotected, see Givhan v. Western Line Consolidated School District, 439 U.S. 410 (1979), the form of Lowman's speech demonstrates that it was less that of "a citizen upon matters of public concern," Connick, 461 U.S. at 147 (emphasis added), and more that of "an employee upon matters only of personal interest." Id. (emphasis added). Lowman was not attempting to inform the public on a matter of current debate, but rather to express his reservations about a superior officer to other members of the Fire Department. Cf. id. at 148 ("Myers did not seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases.").
 
 
 20
 Most telling is the "context" of Lowman's remarks. Lowman chose to tell his colleagues about Hollar six years after the fire, and, more importantly, six years after a very thorough police investigation that had cleared Hollar (and the rest of the Fire Department) of any wrongdoing. Lowman made his decision five years after Taylor told him that he had lied about Hollar's sobriety to the police investigators. Not only was the story stale, but Lowman would have had reasonable grounds to doubt its veracity given Taylor's about-face and the fact that he himself was not present at the 1983 fire. More on the lines of office gossip, Lowman's story recalls what has been said of the plaintiff's speech in Connick: "[i]n that context, [it] had little or no value in informing public debate." Koch v. City of Hutchinson, 847 F.2d 1436, 1454 (10th Cir.1988) (Logan, J., dissenting).
 
 
 21
 In Connick, the Supreme Court cautioned that speech "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest." 461 U.S. at 148 n. 8. Lowman's remarks might well have been of "general interest" to the public in 1983, when memory of the fire was still strong. But on the particular facts presented by this case, Lowman's speech was not of "public concern" and therefore was unprotected for Connick purposes.[3]
 
 
 22
 The judgment of the district court is affirmed.
 
 AFFIRMED
 
 
 [1]
 The subject of Taylor's speech was the same as Lowman's. The district court stated that Pruett's comment that "he ought to shoot" Hardin was, at the very least, insubordination, and at the most, a threat that was not constitutionally protected speech at all, id. at 426. As for Yoder, the district court found that there was no evidence that he had exercised any First Amendment activity whatsoever. Id. at 428
 
 
 [2]
 The district court also held that McGee could not be held liable under Sec. 1983 on a theory of supervisory liability, because there was no evidence that he was deliberately indifferent to or had tacitly authorized any unconstitutional acts, id. at 350-51, 432, and that the plaintiffs had not alleged sufficient facts to support a finding of an unconstitutional policy or custom on the part of the City of Hickory itself. Id. at 354-55, 436
 
 
 [3]
 We note that on appeal, Lowman has pointed to two other forms of speech and association for which he was allegedly fired: 1) his personal association with Tonya Kale, who, after dating him, had dated Chief Hardin; and 2) his counseling another Hickory Fire Department employee, Ann Presslar, to pursue an EEOC discrimination claim. We need not consider whether these allegations state constitutional violations because the only item in the record to support them is the ambiguous and conclusory affidavit of Tonya Kale. "[T]he mere placement ... of conclusory allegations and speculative assertions into affidavits or declarations without further legitimate support clearly does not suffice [to demonstrate a genuine issue for trial]." Guinness PLC v. Ward, 955 F.2d 875, 901 (4th Cir.1992)